[No. D046582. Fourth Dist., Div. One. June 21, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
VINCE V. MISA, Defendant and Appellant.

**COUNSEL**

Greg M. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, and Lilia E. Garcia, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**McINTYRE, J.**—Vince V. Misa appeals a judgment arising out of his conviction of one count of torture and two counts of assault with a deadly weapon and by means of force likely to cause great bodily injury. He contends that: (1) there was insufficient evidence to support his conviction of torture; (2) the torture statute (Pen. Code, § 206) is unconstitutionally vague; and (3) the court improperly imposed a serious felony prior enhancement twice, once on the torture count and once on the second assault count. (All statutory references are to the Penal Code unless otherwise specified.) We conclude that Misa's arguments are unavailing and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of April 25, 2004, Misa, Billy Newton, Joe Salazar, Kevin Hoock, Isaiah Coates and Dale Logie were smoking or "shooting up" methamphetamine at Logie's Oceanside apartment. After they ran out of drugs, Logie left to get more; shortly after Logie returned, Misa, Newton and Salazar left, taking some of the drugs with them. Just after dawn, Misa, Newton and Salazar returned to Logie's apartment. Salazar and Misa were each upset with Hoock, who had apparently stolen some items belonging to them.

Misa, who is of Samoan descent, is six feet three inches tall and weighs approximately 300 pounds; he talked to Logie in the garage, where he picked up a golf club (a driver) and started swinging it around. Sometime between 7:15 and 7:30 a.m., Misa went into the apartment and approached Hoock, who was sitting on a couch in Logie's living room, from behind; Misa used the club to strike Hoock forcefully on the top of the head. Hoock fell to the floor and began to convulse; his skull was "cracked like an egg," exposing brain tissue, and he was bleeding profusely.

Misa was very angry, yelling at Hoock and saying, "you don't steal from me or my old lady," "you're going to pay for this" and "I'm going to teach you a fucking lesson." He taunted Hoock as he poked and prodded Hoock with the club and swung it near Hoock. After Hoock raised his hands to protect his head, Misa accused Hoock of trying to grab the golf club and either hit, or threatened to hit, Hoock again. The testimony of more than one witness suggested that Misa continued to harass Hoock in this manner for 15 to 30 minutes. Misa also used the club to hit Coates, who was sitting across from Hoock, solidly in the chest, knocking the wind out of Coates. Misa then gave up the club to Newton.

Thereafter, Misa and Logie went between the apartment and the garage numerous times over the next 20 to 45 minutes and then left the apartment to

go to the grocery for breakfast food. Although Salazar, Newton and Coates each believed that Hoock needed to be taken to the hospital, none of them called 911 for fear of retribution. Instead, Newton and Salazar, who had had some emergency medical training, tended to Hoock's wound and tried to keep Hoock awake.

By the time Misa and Logie returned with the groceries, Hoock's condition had worsened; he was still bleeding quite a bit, vomiting intermittently and lapsing in and out of consciousness. Salazar told Misa that Hoock needed to go to the hospital, but Misa responded, "he's not going anywhere . . . [h]e still has questions to answer." Misa started to harass Hoock again until Salazar agreed to cook breakfast; Misa and Logie sat across from Hoock as the two ate. After Misa and Logie finished eating, they left the apartment, sometime during the noon hour. After they left, Salazar and Newton took Hoock for medical treatment.

At that time, Hoock was incoherent, almost unconscious and could not walk by himself. He had a six-centimeter laceration on the top of his head and suffered from intracranial hemorrhaging; his injuries were such that the treating physician thought he was likely to have permanent impairment as a result of the attack. Hoock was comatose for 10 days and remained in the hospital for more than two weeks.

In late May, Salazar had Newton turn over the golf club to police. In June, officers searched Logie's apartment; although some of the furniture had been removed and other items had been moved to cover areas where Hoock had lain bleeding, the officers found specks of dried blood, later identified as Hoock's, on other furniture, walls and the pad underneath the carpeting. Thereafter, Misa was charged with one count of torture and two counts of assault with a deadly weapon by means of force likely to cause great bodily injury.

At trial, the prosecution presented evidence of the foregoing, as well as evidence that Hoock continued to suffer from seizures and headaches and had long-term memory problems and impaired thinking processes. Misa did not testify, but introduced alibi testimony by his father, mother and sister that he was at home with them in Vista at the time of the attack.

The jury convicted Misa of all counts and made true findings that he had used a deadly weapon and inflicted great bodily injury. In a bifurcated nonjury proceeding, the court found true the enhancement allegations. The court sentenced Misa to an indeterminate life sentence on the torture count, plus a determinate term of 18 years for the assault convictions and all enhancement allegations, although it stayed the six-year sentence on the first assault count, which related to Misa's attack on Hoock. Misa appeals.

## DISCUSSION

### 1. *Sufficiency of the Evidence to Support the Torture Conviction*

Misa challenges the sufficiency of the evidence to support his torture conviction. He contends, in part, that the evidence introduced at trial does not support the jury's findings that he acted with the specific intent to cause cruel or extreme pain or that he acted for revenge, persuasion or any sadistic purpose. We conclude that under the standards for establishing torture as set forth by California Supreme Court precedents, Misa's argument is not well taken.

In reviewing the sufficiency of the evidence to support a conviction, we determine " 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting *People v. Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017].) Under such standard, we review the facts adduced at trial in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions. (*People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

In considering the sufficiency of the evidence, we cannot reweigh the evidence, as the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) Rather, we simply consider whether any rational trier of fact could have found the essential elements of the charged offenses beyond a reasonable doubt. (*People v. Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict," the conviction will not be reversed. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429 [180 Cal.Rptr. 391].)

■ Section 206 provides that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury . . . upon the person of another, is guilty of torture." The intent necessary for torture, that is, to cause cruel or extreme pain, does not require that the

defendant acted with premeditation or deliberation or had the intent to inflict prolonged pain. (*People v. Hale* (1999) 75 Cal.App.4th 94, 107 [88 Cal.Rptr.2d 904].) Direct evidence of specific intent is rarely available, although the circumstances surrounding the offense or other circumstantial evidence may permit an inference that one acted with the intent to inflict cruel or extreme pain. (*People v. Mincey, supra,* 2 Cal.4th at p. 433; *People v. Jung* (1999) 71 Cal.App.4th 1036, 1043 [84 Cal.Rptr.2d 5].) ▪ Here, the circumstantial evidence is sufficient to permit a reasonable trier of fact to conclude that Misa acted with "the cold-blooded intent to inflict pain for personal gain or satisfaction," as necessary to support a conviction for torture. (See *People v. Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665].)

Misa used a golf driver, a club with a substantial head, to strike Hoock's head and, in doing so, used force sufficient to crack Hoock's skull at a location where the skull was close to a half-inch thick. After causing Hoock substantial and visible injuries, Misa continued to taunt Hoock, poking and prodding him with the golf club and swinging the club in the air around Hoock as he continued to yell profanities and make threats against Hoock for an additional 30 minutes. His comments, "you're going to pay for this" and "I'm going to teach you a fucking lesson," provide further evidence that Misa intended to inflict cruel or extreme pain on Hoock. In addition, Misa's callousness in refusing to allow Salazar and Newton to take Hoock to the hospital and in sitting across from Hoock, who was vomiting and lapsing in and out of consciousness, while he ate breakfast strongly cuts against Misa's argument that he acted in an "explosion of violence" resulting from a sudden quarrel rather than a calculated purpose of causing Hoock to suffer.

Here, the totality of the circumstances, including the level of violence, the nature of Hoock's injuries, the manner in which Misa inflicted them and Misa's callous indifference in the face of Hoock's obvious need for medical intervention support the inference of an intent to cause cruel pain and suffering. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1239 [278 Cal.Rptr. 640, 805 P.2d 899] [evidence that the defendant broke the five-month-old victim's ribs and cut her with a knife after she continued to cry, slammed her head against a rock and stepped on her back was sufficient to support intent to torture for purposes of torture murder]; *People v. Mincey, supra,* 2 Cal.4th at p. 428 [requisite intent may be inferred from evidence that the defendant beat the five-year-old victim repeatedly over a period of 24 to 48 hours and caused hundreds of injuries, including swelling of the brain]; *People v. Proctor* (1992) 4 Cal.4th 499, 531–532 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [evidence that the defendant dragged a knife across the victim's body slowly and deliberately permits an inference that he intended to cause the victim pain or fear sufficient to support a conviction for torture murder]; see also *People v. Baker* (2002) 98 Cal.App.4th 1217, 1224 [120

Cal.Rptr.2d 313] [scarring and disfigurement from the defendant pouring gasoline over the victim's head and lighting her on fire sufficient as evidence of intent].) Accordingly, we uphold his conviction for torture.

## 2. *Challenge to Section 206 on Vagueness Grounds*

A criminal statute is void for vagueness if it fails to provide adequate notice to ordinary people of the kind of conduct prohibited or if it authorizes arbitrary and discriminatory enforcement. (*Kolender v. Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 103 S.Ct. 1855]; *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115–1116 [60 Cal.Rptr.2d 277, 929 P.2d 596].) To satisfy constitutional mandates, a statute must: (1) be sufficiently definite to provide adequate notice of the conduct that is proscribed; and (2) provide sufficiently definite guidelines for the police so as to prevent arbitrary or discriminatory enforcement. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1106–1107 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) Only a reasonable degree of certainty is required and there is a strong presumption in favor of the constitutionality of statutes; thus a statute will not be held void for uncertainty if any reasonable and practical construction can be given to its language. (*Id.* at p. 1107.)

Misa admits that section 206 has withstood void-for-vagueness challenges in the past. (See *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1204–1205 [68 Cal.Rptr.2d 619] [holding that the meaning of "torture" is not unconstitutionally vague notwithstanding its use of the words "cruel" or "extreme" pain and "sadistic purpose"]; *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1564–1570 [18 Cal.Rptr.2d 395] [similar]; *People v. Talamantez* (1985) 169 Cal.App.3d 443, 456–457 [215 Cal.Rptr. 542] [rejecting a similar challenge to the torture-murder statute]; see also *People v. Raley* (1992) 2 Cal.4th 870, 899–901 [8 Cal.Rptr.2d 678, 830 P.2d 712] [inclusion of the words "sadistic purpose" in the jury instruction on torture murder did not render the instruction too uncertain for the jury to understand the charge].) He argues, however, that we should reconsider the issue anew, essentially because these cases were wrongly decided. We reject his contention that an ordinary person cannot understand what conduct is prohibited by section 206 and thus decline his invitation to hold the statute unconstitutional on this basis.

## 3. *Imposition of Two Serious Prior Felony Enhancements*

Penal Code section 667, subdivision (a)(1) provides in pertinent part: "[A]ny person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms

of the present offense and each enhancement shall run consecutively." In *People v. Tassell* (1984) 36 Cal.3d 77, 90 [201 Cal.Rptr. 567, 679 P.2d 1] (*Tassell*), overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 380, 401 [27 Cal.Rptr.2d 646, 867 P.2d 757], the California Supreme Court held that the prior conviction enhancement created by this statute is a status enhancement (that is, an enhancement that relates to the nature of the offender rather than one that relates to the nature of the current offense) and that, as such, the enhancement may be used to enhance a determinate sentence only once, regardless of the number of determinate terms that make up the total sentence. Misa contends that, in accordance with *Tassell*, the court erred in imposing the prior conviction enhancement twice, once on the determinate term imposed on the assault count and again on the indeterminate term imposed on the torture count. The Attorney General responds that, as made clear in the California Supreme Court's more recent decision in *People v. Williams* (2004) 34 Cal.4th 397, 402 [19 Cal.Rptr.3d 619, 98 P.3d 876] (*Williams*), *Tassell* is inapplicable to indeterminate sentences where the defendant is subject to the "Three Strikes" law. We agree with the latter argument. (The Attorney General also urges us to make a broader finding that the analysis of *Williams* applies to *any* indeterminate sentence, including one that is imposed on a defendant who is not subject to the Three Strikes law at all. Because this issue is not presented by the facts of this case, we decline to address the broader issue.)

In *Williams*, the defendant was convicted of multiple felonies that qualified as serious or violent and was found to have suffered from two prior felonies that also qualified as strikes. In accordance with section 667, subdivision (e)(2), the trial court sentenced the defendant to indeterminate life terms for each of the current felonies and also imposed two additional five-year enhancements (one for each of the prior convictions) on each current count. (*Williams, supra*, 34 Cal.4th at pp. 400–401.) The question on appeal was whether the sentence so imposed violated *Tassell*'s limitation on the imposition of a prior conviction enhancement to one per aggregate sentence. (*Williams, supra*, 34 Cal.4th at p. 401.)

In determining that the analysis of *Tassell* was inapplicable to a third strike defendant, the court reasoned in part:

". . . *Tassell* relied on the language of section 1170.1, and not on the language or legislative history of section 667(a), in concluding that at sentencing a trial court must impose a sentence enhancement for a prior felony conviction—including a section 667(a) enhancement—only once, regardless of the number of new felony offenses.

"Section 1170.1, however, applies only to *determinate* sentences. It does not apply to multiple indeterminate sentences imposed under the Three

Strikes law." (*Williams, supra*, 34 Cal.4th at p. 402, original italics.) The court went on to conclude that based on the language of section 667, subdivision (e) indicating that the increased penalties for second and third strike offenses were to be imposed "in addition to any other enhancement or punishment provisions which may apply" and the requirement that a third strike sentence must "be served consecutive to any other term of imprisonment for which a consecutive term may be imposed by law," the five-year enhancement for a prior conviction provided for in section 667, subdivision (a) was required to be imposed as to each qualifying felony of which the defendant (in that case, a third striker) was currently convicted. (§ 667, subd. (e); *Williams, supra*, 34 Cal.4th at p. 404.)

Here, Misa was not subjected to an indeterminate sentence under the Three Strikes law, but instead received an indeterminate life sentence on the torture count (§ 206), the minimum commitment for which was then doubled pursuant to section 667, subdivision (e)(1). Because he was not subjected to multiple indeterminate sentences pursuant to the Three Strikes law as was the defendant in *Williams*, the California Supreme Court's analysis in that case is not directly dispositive of the issue before us. However, we conclude that a similar analysis is applicable here.

Notably, the statutory language in section 667, subdivision (e) that the *Williams* court relied on in part to determine that the prior conviction enhancement must be applied to multiple strike offenses in third strike cases also applies to second strike sentences and thus supports the conclusion that a logical application of the *Williams* analysis in this context would require the imposition of the prior conviction enhancement on Misa's second strike offense (the torture count) notwithstanding that the enhancement was also imposed as a status enhancement relating to the determinate term on the assault count. (See also *Williams, supra*, 34 Cal.4th at p. 402 [stating that section 1170.1, on which *Tassell* relied, does not apply to indeterminate sentences].)

Further, the California Supreme Court's analysis in *Williams* relied in part on the fact that the section 667, subdivision (a) enhancement was enacted as part of a statutory and constitutional scheme intended to increase sentences for recidivist offenders. (*Williams, supra*, 34 Cal.4th at p. 404.) The high court reasoned:

"Adding the five-year enhancement separately to the third strike sentence for each new serious felony conviction is not inconsistent with [the intent to increase sentences for recidivist offenders].

■ "Adding the five-year enhancement to the sentence for each new serious felony conviction is also consistent with the logic of the Three Strikes law. Under that law, the status or nature of the offender as a person previously convicted of serious felony offenses does not result merely in a single additional term of imprisonment for each prior conviction added on to the overall sentence that would otherwise be imposed for all of the new offenses. Instead, the Three Strikes law uses a defendant's status as a recidivist to *separately* increase the punishment for *each* new felony conviction. *For a defendant with a single qualifying prior conviction, the sentence for each new offense is double what it otherwise would be.* (§§ 667, subd. (e)(1) . . . , 1170.12, subd. (c)(1) . . .; see *People v. Nguyen* [(1999) 21 Cal.4th 197,] 202–207 [87 Cal.Rptr.2d 198, 980 P.2d 905].) For a defendant with two or more qualifying prior convictions, the sentence for each new offense is life imprisonment with a minimum term of at least 25 years. (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2).)

■ "The Three Strikes law, *unlike section 1170.1*, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses, *and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense.* Accordingly, we conclude that, under the Three Strikes law, section 667(a) enhancements are to be applied individually to each count of a third strike sentence." (*Williams, supra,* 34 Cal.4th at pp. 404–405, fn. omitted, some italics added.)

Although Misa was a second strike defendant rather than a third striker, he is nonetheless a recidivist and, pursuant to the foregoing analysis of the applicable statutory scheme, is thus subject to a prior conviction enhancement under section 667, subdivision (a) on the torture count even though he also received a similar enhancement relating to the assault count. Accordingly, we affirm.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Nares, J., concurred.

**McINTYRE, J.,** Concurring.—The crime of torture as codified in Penal Code section 206 was adopted by the voters as Proposition 115 in response to the facts of *People v. Singleton* (1980) 112 Cal.App.3d 418 [169 Cal.Rptr. 333] (*Singleton*). (*People v. Pre* (2004) 117 Cal.App.4th 413, 425 [11 Cal.Rptr.3d 739] (conc. & dis. opn. of McIntyre, J.) (*Pre*).) There, the defendant was sentenced to 14 years four months in prison for kidnapping and sexually abusing

his victim and then chopping off her hands and dumping her in a ditch in a remote location; he gained public notoriety when he was paroled after serving just seven years. In response, Proposition 115 created a new crime of torture " ' "to insure that crimes such as Singleton's receive a minimum punishment of life imprisonment." ' " (*Pre, supra*, 117 Cal.App.4th at p. 425 (conc. & dis. opn. of McIntyre, J.), quoting *People v. Jung* (1999) 71 Cal.App.4th 1036, 1048 [84 Cal.Rptr.2d 5] (dis. opn. of Armstrong, J.).)

Notwithstanding the originally proffered basis for Proposition 115, very few, if any, of the cases upholding torture convictions have involved facts analogous to those of *Singleton*. While I continue to believe that Penal Code section 206 was not intended to alter the existing legal definition of torture (*Pre, supra*, 117 Cal.App.4th at p. 425 (conc. & dis. opn. of McIntyre, J.), I nonetheless conclude that, for the reasons stated in the majority opinion, the facts before us in this case establish conduct that is sufficiently violent and callous as to support Misa's conviction for torture consistent with the statutory elements of the offense and the voters' underlying intent.

A petition for a rehearing was denied July 19, 2006, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 11, 2006, S145302. Kennard, J., and Werdegar, J., were of the opinion the petition should be granted.