[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts I.-IV. of the Discussion.
OPINION
A jury convicted defendant Tadashi Nakia Sayres of two counts of forcible rape (§ 261, subd. (a)(2)),[1]
and found true the allegations in each count that he personally used a deadly weapon (a knife) (§ 12022.3, subd. (a)) and that he committed the crimes during the commission of *Page 1042 burglary while using a deadly weapon (§ 667.61, subds. (a), (e)).[2] He admitted a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The trial court sentenced him to a total term of 86 years to life in state prison. He appeals from the judgment, contending (1) the judgment must be reversed because the court reporter cried during a readback of testimony; (2) the trial court erred in excusing a juror during deliberations; (3) the trial court erred in excluding evidence that the victim in the instant case made an allegedly false prior accusation of attempted rape; (4) the court erred in imposing a five-year enhancement under section 667, subdivision (a), on each of the counts on which defendant was convicted; and (5) the court's selection of the upper term for the rape conviction and the knife use enhancement on count 2 violated Cunningham v.California (2007) 549 U.S. ____ [166 L.Ed.2d 856,127 S.Ct. 856] (Cunningham). We affirm.
 BACKGROUND
Prosecution Case-in-chief
 In the early morning hours of March 28, 2001, defendant burglarized the Palmdale apartment of Melissa M. and raped her twice at knifepoint while her infant daughter slept in another room. The prior evening, when Melissa went to bed, she locked her apartment doors and windows except the dining room window, which she left open a few inches for ventilation.
 Shortly after midnight, she was awakened by the noise of a man talking. Defendant stood in the hallway of Melissa's apartment, and asked her questions suggesting that he was looking for two individuals, one of whom owed him money. Melissa said that she lived alone and did not know the people defendant was looking for. Defendant sat on Melissa's bed. For perhaps half an hour, he talked about his mother and how his life was not fair. He then went to use the bathroom, which was located across the hall. While he was gone, Melissa put on a nightgown and underwear.
 Melissa headed for the kitchen to use the telephone, but encountered defendant, who held a knife that was eight to 10 inches long. Melissa asked him if he wanted a drink from the kitchen. Defendant said he did not. When Melissa reached the living room, defendant backed her up to the couch, placed the knife against her neck, and told her to sit down. She-complied, whereupon he used the knife to cut away and remove her underwear. Melissa said, "No," but defendant told her to be quiet. He removed her nightgown, took off his jacket, and unzipped his pants. He ordered her to lie on the couch. When she did so, he had intercourse with her. *Page 1043 
 Defendant said Melissa was moving, and he became angry. He put the knife to her throat, and forced her into her bedroom. He ordered her to lie on her bed, which she did. Defendant then had intercourse with her again. He wiped himself on the blanket, and talked to Melissa about his mother and the Book of Mormon. Melissa smelled alcohol on his breath.
 Eventually, defendant said he was going to his car to get the Book of Mormon, and walked out the front door. Melissa locked the door after him, and locked the dining room window. She noticed that the window was wide open, and the screen was on the grass several feet away. Melissa went into her daughter's bedroom, where her daughter was still sleeping. Melissa hid under the desk, and called 911. A recording of the call was played for the jury.
 Los Angeles County Deputy Sheriff Manuel Plasencia arrived. Melissa was crying and upset. She had "red lumps" on her neck in a straight line as if caused by a knife blade. Deputy Plasencia took Melissa to Antelope Valley Hospital Medical Center, where she underwent a sexual assault examination.
 More than three years later, in August 2004, Los Angeles County Sheriffs Detective Gregory Minster received notice from the bureau of scientific services that there was a DNA "hit" in Melissa's case, and he was informed of the identity of the suspect — defendant. Detective Minster placed defendant's photograph in a photographic six-pack and interviewed Melissa. Melissa picked two photographs — defendant's and that of another man — as possibly being her assailant, but she was not sure.
 Detective Minster went to the address listed on defendant's Department of Motor Vehicles information, and spoke to defendant's girlfriend, who said that she would have defendant call him. About an hour later, defendant called Detective Minster. The detective told defendant that he had a 2001 case that might involve him. Detective Minster asked defendant about women he had been with in 2001. Defendant said that in 2001, he had been with his ex-wife and his ex-girlfriend. Detective Minster asked him to come to the station that day. Defendant agreed, but never appeared.
 Sean Yoshii, a criminalist with the Los Angeles County Sheriff's Department, compared a sample from the vaginal swab of Melissa's sexual assault examination to a cheek swab from defendant. In Melissa's sample, he found a mixture of DNA from Melissa and defendant. Defendant is African-American, according to Yoshii. The probability of a Black male other than defendant having made the DNA contribution was one in 1.8 billion.
 At trial, Melissa identified defendant as her attacker. She testified that she had never met defendant before. The underwear she was wearing on the night of the attack, cut on both sides, was introduced at trial. *Page 1044 Defense
 Defendant testified in his own defense. He admitted having intercourse with Melissa, but testified that it was consensual. According to defendant, he met Melissa, whom he remembered as Heather, at a Palmdale nightclub called Louisiana Hots. Defendant bought Melissa some drinks, and she had some ecstasy with him. He left the club alone in his car, and followed Melissa to her apartment. He asked her if he could use the bathroom. When he came out, Melissa was in the bedroom, and told him to "come here." He walked to the room, where Melissa was sitting on the bed. They had consensual sex. He later left in his car.
 DISCUSSION
I.-IV.*
I. The Court Reporter's Crying During Readback
 Defendant contends that the judgment of conviction must be reversed because the court reporter cried during a readback of Melissa's testimony. According to defendant, the court reporter's conduct "constituted prejudicial misconduct, amounted to evidence received by the jury from a source outside the trial and effectively made the reporter a witness not subject to cross-examination." We disagree.
The Proceedings
 On the first full day of deliberations (July 13, 2005), at 2:55 p.m., the jury[3] requested a readback of Melissa and defendant's testimony. The jury continued with deliberations, and adjourned at 4:40 p.m. At 8:55 a.m. the next day (July 14, 2005), the court reporter began the requested readback, which was completed at 9:40 a.m.
 At 11:00 a.m., the court received two notes from the jury. The first was a question from the jury asking whether, if the jury was "unable to answer one of the special conditions (burglary) do the others still apply," and whether one or more of the "conditions" could be left blank. The second was a note from Juror No. 6, who asked to speak to the judge "regarding a personal problem."
 At 11:25, the courthouse was evacuated, and the jurors did not resume deliberations until 1:40 p.m. In the meantime, the court held a proceeding outside the jury's presence. The court stated: "This morning the court reporter read back to the deliberating jury the testimony of the alleged victim, and the defendant. After she finished she came to the court and indicated to the court that she did not remain dry-eyed during the reading of the testimony of the alleged victim in this case, and that one of the jurors handed her a Kleenex because she was somewhat tearful. She didn't say she was crying profusely, she just indicated that there was a tear or so. And because of that, the court called both attorneys."
 Defendant's counsel moved for a mistrial, relying by analogy on People v. Lucero (1988) 44 Cal.3d 1006, which involved spectator misconduct. Counsel argued that the court had not immediately instructed the jury to disregard the court reporter's conduct, that the jury had continued to deliberate after the incident, and that that the jury had then sent out a note regarding the special findings. He contended that "it's a reasonable inference from the most recent question that came out . . . that they have reached a verdict as to the substantive counts." If the court did not grant a mistrial, defense counsel asked that the court undertake an examination of the jurors to determine whether they were exposed to prejudicial misconduct, and, if so, whether it would affect their decision.
 The prosecutor suggested that the court reporter did not engage in misconduct, and that an admonition to the jury would suffice. The court decided to give an admonition to the jury, and further stated that in the event of a guilty verdict the court would conduct an inquiry of the jurors.
 The jurors were summoned, and the court instructed: "Ladies and Gentlemen, we have one admonishment to make to you, and that is as follows: do not consider any facts outside the record, and do not be influenced by any emotional display you may have observed. You're excused to go back and deliberate once more."
 After the jury retired, the court briefly discussed other matters with counsel. The court then summoned Juror No. 6 to inquire about that juror's note. Ultimately, the court excused Juror No. 6, and seated an alternate juror. The court then instructed the jury to set aside all prior deliberations, and begin deliberations anew.[4] The jury retired for new deliberations at 2:30 p.m., and notified the court at 3:05 p.m. that it had reached a verdict. Defense counsel did not again request an inquiry of the jury regarding the court reporter's conduct during the rereading of Melissa's testimony, and the court took the verdicts in open court and ordered them recorded.
Absence of Prejudice
 That the court reporter did not "remain dry-eyed" while rereading Melissa's testimony, and that she shed "a tear or so" and received a Kleenex from a juror, was unfortunate. But it does not require reversal of the judgment. Contrary to the approach taken in the appellant's opening brief, there is no need to engage in a lengthy discussion of whether the incident should be treated like spectator misconduct, prosecutorial misconduct, or some new type of "court employee and court official" misconduct. Regardless of the rubric used to describe the incident, and under any standard of review — the test for state constitutional error under People v.Watson (1956) 46 Cal.2d 818, 836, or the more stringent test for federal constitutional error under Chapman v.California (1967) 386 U.S. 18, 36 (Chapman) the incident was not prejudicial.
 First, as described by the trial court, the court reporter's emotional display was minor in nature. Second, the rereading of Melissa's testimony occurred in the context of a review of evidence by the jury that included (before the readback) Melissa's 911 call and testimony regarding the red marks on her neck, and (at the same time as the readback) a rereading of defendant's testimony. Hence, Melissa's testimony was not considered in isolation, making it much less likely that the court reporter's minor emotional display during her readback of that testimony affected consideration of the evidence as a whole. Third, the court instructed the jury not to "consider any facts outside the record," and not to "be influenced by any emotional display you may have observed" — a clear reference to the court reporter's conduct and an admonition to disregard it. Fourth, after the removal of Juror No. 6 and the seating of an alternate juror, the court instructed the jury to "set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place. [¶] You shall now retire to begin anew your deliberations in accordance with all the instructions previously given." Thus, the jury was required to set aside any deliberations that occurred both before and after the rereading of Melissa's testimony. The jury must be presumed to have followed the court's instructions, and there is nothing in the record to undercut this presumption. (People v. Bonin (1988)46 Cal.3d 659, 699.) We conclude that under any standard, the court reporter's shedding "a tear or so" and receiving a Kleenex from a juror during the rereading of Melissa's testimony did not deprive defendant of a fair trial.
II. Removal of Juror No. 6
 Defendant contends that the trial court erred in excusing Juror No. 6 during deliberations. We are not
 The Proceedings
 As we have noted, during jury deliberations the court received a note from Juror No. 6, who asked to speak to the judge "regarding a personal problem." At a hearing outside the presence of the other jurors, Juror No. 6 informed the court that she "would like to get off the trial." She explained: "It is too emotional [and] stressful for me at this time. I have a lot of . . . situations going on. I feel that what I'm going through in the jury room, I shouldn't have to go through that. There [are] a lot of outside personal issues that I'm dealing with [and] I cannot handle the stress of all this. . . . I've given it my all, but I don't . . . want to serve on the jury."
 In response to questions from the court, the juror confirmed that she was deliberating with the other jurors and voting when appropriate. When asked if she could offer any more details, the juror replied: "This is where this is really emotionally stressful for me. . . . Because I feel that I'm being singled out in the jury room and have a lot of outside influences. . . . I have cancer, and one of the . . . issues is that my treatment has been prolonged and put off because I'm . . . serving on this jury. And I tried to do my civic duty to do that, and we're not going anywhere. I don't want to give in to the other jurors just based on what they believe . . . and not give this defendant a fair trial. And based on my personal reasons because I have other issues going on that I need to take care of, and that is really stressing on me, along with this stress, and emotionally I can't deal with that at this time." The court inquired whether the juror was undergoing chemotherapy, and the juror replied that she was "not taking it now," but was "supposed to be."
 The court asked why the juror did not disclose her condition before trial. The juror stated: "Because at the time . . . I was waiting for my insurance to start up. . . . I've been on chemotherapy for about a month and I didn't realize that the case was going to last this long. And I was willing to put it off for a couple of days, and it seems to be lasting longer. . . . [T]he jurors are — and rightfully so [— standing] on their convictions, how they want to go, and we don't seem to be getting anywhere. And you can't force anyone to make decisions. And I don't know how long this is going to take, and the fact that it's being prolonged is really wearing on me physically."
 The court stated that "hopefully [the case] will be over sometime this week. Today is Thursday, we've got Friday." The juror responded: "That helps, but do you understand that I'm saying that emotionally this is very stressful for me." She also stated that she would rather be undergoing her chemotherapy treatment.
 The court permitted the attorneys to question the juror. Defense counsel asked whether the juror felt she was "being pressured or pushed into trying to vote a certain way because of" her race, and whether she felt she was "at a point where [she was] wanting to just go along with the others to . . . get this over with." The juror answered "yes" to both questions. Defense counsel inquired whether the juror realized that the prosecution and defense had a right to her individual opinion. The juror responded: "I realize that, but the stress of this, I don't feel is worth my health and worth just taking that risk. And the stress is just too high for me . . . right now emotionally. I'm not in the emotional state — I'm not emotionally stable to deal with this at this time." Pressed by defense counsel again on her obligation to vote her individual opinion, the juror stated: "I've made every effort do that, but I'm just not emotionally equipped right now to go on with this case."
 The prosecutor then asked whether the juror believed the stress was detrimental to her health. The juror stated that she thought "it could be if it continues." She also stated that if she were not on the jury her chemotherapy would probably start on the following Monday. The court asked whether the juror could "last through tomorrow and if it goes beyond tomorrow" the juror could be replaced. The juror replied, "No."
 Out of the juror's presence, the court heard argument from counsel. Defense counsel argued, in substance, that the juror was a "hold out" who felt "pressured because of her race" and who had not given the court cause to excuse her. The prosecutor argued that the juror's concern about her health and its effect on her ability to deliberate constituted good cause for excusal. The prosecutor also noted, and the court confirmed, that the juror "was in tears and crying as she was sitting in the jury box."
 The court indicated that it would excuse the juror, but then recalled the juror for "a couple of questions." The juror then confirmed that she could probably begin her chemotherapy as early as the next day. Asked by the court whether that was what she wanted to do, the juror replied: "I put it off, and I tried to deliberate, and I gave it my best, but because of my stress level in this case and just things that are going on personally which may not be an actual excuse to get off of the jury because everybody has personal problems, a combination of all those is just really stressful for me right now, and I don't think that I can deal with it emotionally. And my health is [not] a good factor to add to that equation at this point." The juror confirmed that she did not want to continue further. The court asked, "And you won't deliberate anymore if we sent you back there again; is that right?" The juror responded, "I mean if you tell me that I have to, because it's the law; I don't want to break the law, but I would be reluctant to do so." The court explained that "of course, it is the law that you need to . . . deliberate as long as you can with them and come to a verdict if you can. However, if you believe that it's detrimental to your health and that you can start chemotherapy tomorrow morning and that it's probably not likely you're not going to reach a verdict this afternoon, then I think what I'm going to do is relieve you. But I want to be sure that you are telling us that you don't think you can go on and you don't want to and you would really rather refuse to deliberate any further[.] Is that true?" The juror responded, "Yeah. I wouldn't be out here if that wasn't the case." The court then found good cause, excused the juror, and seated an alternate.
 Good Cause to Excuse Juror No. 6
 Section 1089 provides in relevant part that the trial court may discharge a juror "[i]f at any time, whether before or after the final submission of the case to the jury, a juror . . . becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor." "[W]e review a trial court's determination to discharge a juror by applying an abuse of discretion standard and will uphold that decision if there is substantial evidence supporting it. We also require a juror's inability to perform as a juror to appear in the record as a `"`demonstrable reality.'"' [Citations.]" (People v. Boyette (2002) 29 Cal.4th 381, 462.) Under our Supreme Court's "more modern" approach, "a trial court `hasbroad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve.'" (Id.
at p. 462, fn. 19.)
 In the instant case, the record shows that: (1) Juror No. 6 was suffering from cancer, a fact that was unknown until she requested to be discharged; (2) she had interrupted her chemotherapy treatment to serve on the jury, but did not anticipate the length of time she would be forced to suspend her treatment; (3) her concern over her health, and the stress of deliberations, made her emotionally unable to continue serving as a juror; (4) she had made every effort to give the parties her individual determination but she was "not emotionally equipped right now to go on with this case"; (5) although she would continue to deliberate if ordered, she would be "reluctant to do so"; (6) when asked whether she was stating "that you don't think you can go on and you don't want to and you would really rather refuse to deliberate any further," the juror responded, "Yeah. I wouldn't be out here if that wasn't the case"; and (7) the juror "was in tears and crying as she was sitting in the jury box" during inquiry by the court and counsel.
 "[B]oth trial-related and non-trial-related stress can provide good cause for discharging a juror." (People v. Diaz (2002) 95 Cal.App.4th 695, 703.) Here, the trial court had more than ample cause to conclude that the stress caused by jury deliberations and the juror's health condition rendered her emotionally incapable of fulfilling her duty as a juror. We have no difficulty concluding that the juror's disability appears as a demonstrable reality, and that the trial court did not abuse its discretion in excusing her.
 Defendant contends that the court failed to inquire into whether other jurors had engaged in misconduct. However, the record does not suggest that any misconduct occurred. At one point Juror No. 6 answered affirmatively when asked whether she felt she was being pressured to vote a certain way because of her race. But she also said that the other jurors were "rightfully" expressing their own views of the case. She made no allegation of improper conduct on the part of any juror, and no investigation of juror misconduct was called for.
 III. Exclusion of Evidence that Melissa Made An Allegedly Prior False Allegation of Attempted Rape
 Defendant contends that the trial court erred in excluding evidence regarding an allegedly false accusation of attempted rape made by Melissa against another man. We disagree.
 The Proceedings
 Before trial, defense counsel filed a written motion to admit evidence of sexual conduct by Melissa under Evidence Code section 782, subdivision (a)(1), to impeach her credibility.[5] Defendant sought to introduce evidence that Melissa engaged in lewd and suggestive behavior, and that she had made a false accusation of attempted rape against Elfido Lopez, a maintenance worker at the apartment complex where she used to live. Attached to the motion was an offer of proof in the form of an October 2003 incident report written by a sheriff's deputy, and a series of June 2005 witness interview summaries prepared by a defense investigator. On appeal, defendant does not contend that the court erred in excluding his proffered evidence of Melissa's alleged lewd conduct. He[6]
challenges only the exclusion of the prior allegedly false accusation of attempted rape.
 According to the sheriff's deputy's incident report attached to defendant's motion, in October 2003 the deputy interviewed Melissa, who said "that approximately a year and a half ago" a maintenance man at the apartment complex named Jose attempted to rape her. Melissa explained that one evening she locked herself out of her apartment, and asked Jose, who had keys to the units, to let her in. He did so, and followed her into the rear bedroom of the apartment. Jose pulled Melissa's pants and panties down to her knees, pushed her down on the bed, and tried to have intercourse with her. Melissa struck Jose, and he left. According to Melissa, Jose was very drunk. Melissa had told a friend, Charles Stanton, a police officer at Antelope Valley College, about the incident. He had told her she should report it, but she did not want to "mess up" Jose's life. Melissa told the sheriff's deputy that she had decided to report the incident now because she was having problems with the apartment manager, who insisted on having Jose make repairs at Melissa's apartment. Melissa did not want Jose to be around her, and told the manager about the attempted rape. The manager did not believe her, and insisted on Jose doing the work.
 After interviewing Melissa, the deputy interviewed the apartment manager, Cheryl Moore. Moore stated that Melissa was a problem tenant who was in violation of several terms of her rental agreement. When Moore told Melissa that Jose would be making some repairs to the interior of Melissa's apartment, Melissa demanded that another maintenance worker do the work, and claimed that Jose had attempted to rape her. Moore did not believe Melissa. Moore identified Jose as Elfido Lopez, who lived in the complex with his wife and two children.
 Next, the deputy interviewed Elfido Lopez, who denied Melissa's accusation, and said that he did not know why Melissa would start such a rumor. Lopez did not remember any incident in which Melissa was locked out of her apartment, and he never carried keys to the apartments.
 In concluding his report, the deputy wrote that he was unable to determine whether a crime had been committed. No criminal charges were ever filed.
 Also attached to the motion were several reports written by a defense investigator summarizing his interviews of potential witnesses in June 2005. The investigator interviewed Elfido Lopez, who recounted certain instances of sexually charged behavior by Melissa. He stated that Melissa "was always sexual in her demeanor" and "would do `little things, she exposed herself, you could see stuff.'" He denied that he ever made sexual advances toward Melissa or attempted to rape her.
 The defense investigator interviewed Charles Stanton. Stanton said that Melissa had told him about the incident in which Elfido Lopez had attempted to rape her. Stanton had told her to report the incident to the police. Melissa had also told Stanton of another incident in which she was raped.
 In supplemental briefing, defense counsel proposed (as here relevant) to ask Melissa the following questions: "How many times have you been raped, other than the time for which we are in court?" "How many times have you reported being raped?" "Do you know Elfido Lopez?" "Have you ever reported an attempted rape by Elfido Lopez?" "Did you ever tell Charles Stanton, Cheryl Moore, or Elfido Lopez that you had been previously raped?" "Did you ever tell anyone that you had been raped twice before and that's how you now have two children?"
 In the supplemental briefing, defense counsel argued that Melissa's accusation of attempted rape against Elfido Lopez was a false allegation, because no arrest occurred and no charge was filed. Therefore, according to defense counsel, the evidence was relevant to impeach Melissa's credibility under Evidence Code section 782.
 The prosecutor filed a written opposition to defendant's motion. As here relevant, the prosecutor argued that there was no basis on which to conclude that Melissa's accusation against Lopez was false. Further, even if the proposed evidence had some probative value, under Evidence Code section 352 such probative value was outweighed by the confusion and consumption of time that would occur through a mini-trial concerning whether Melissa's claim against Lopez was true.
 At the hearing on the motion, the court inquired of defense counsel how he intended to introduce evidence of the supposedly false allegation against Lopez. Defense counsel proposed to question Melissa regarding "whether she had made certain statements to the deputy," and then (if necessary) to call the deputy as a witness to impeach her with prior inconsistent statements. Assuming Melissa testified that the attempted rape occurred, then the jury could evaluate "whether it's [an] incredible, unbelievable statement." The court noted that there was no evidence that Melissa's accusation was false. Defense counsel responded that the falsity of the accusation was shown by "the fact that . . . nobody [was] arrested, nobody interrogated, no prints, no filing, no preliminary hearing, no trial; it is something that the jury can draw an inference from, but there's been [an] evaluation made that this is not a case that was truthful."
 The trial court denied defendant's motion. The court implicitly concluded that the evidence was not relevant because there was no evidence the prior accusation was false, and also implicitly concluded under Evidence Code section 352
that any probative value was outweighed by the potential prejudice of having to litigate the veracity of the prior allegation. The court reasoned in part that "the problem with it is that . . . the jury would be trying the other case" and "[t]here is no evidence that she made a complaint that was not true. There is some inference . . . that she told a story to the police officers that either they didn't believe or they took it to the D.A. and the D.A. rejected it; but that's not enough to say it has been proven that this person gave a false report to an officer."
 The Trial Court Did Not Err
 We conclude that the trial court did not err in excluding defendant's proffered evidence. Defendant contends that "the parties and the trial court" were mistaken in analyzing defendant's motion under Evidence Code section 782, because evidence of a false accusation is not sexual conduct. However, the issue is forfeited. Defense counsel expressly brought the motion under Evidence Code section 782, seeking to admit evidence of sexual conduct. In oral proceedings in the trial court, he agreed with the trial court that his motion should be analyzed under, inter alia, Evidence Code section 782. He never argued that section 782 did not apply. Indeed, he specifically sought permission to ask Melissa, inter alia, how many times she had been raped in the past — a specific reference to prior sexual conduct. Having expressly sought to have his proposed evidence admitted under Evidence Code section 782, and having never objected to the trial court's reference to that section, defendant cannot contend on appeal that the trial court erroneously referred to that section. (See generally, 6 Witkin 
Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 36, p. 495.)[7]
 "Read as a whole, [section 782] empowers the trial judge first to accept the [defendant's] offer of proof as true. He then determines whether, if the evidence is as the defendant claims, it is relevant and if relevant whether its probative value is outweighed by the probability of undue prejudice or the undue consumption of trial time. (Evid. Code, § 352.) Only if the judge determines both questions in favor of admissibility is the offer of proof `sufficient.' Only if it is `sufficient' is the trial court required to conduct the hearing to determine if the offer truly recites what the evidence will be." (People v. Blackburn (1976)56 Cal.App.3d 685, 691-692.)
 In the instant case, the evidence defense counsel actually proposed to introduce was not relevant to attack Melissa's credibility. As defense counsel explained at the hearing on the motion, he intended to question Melissa concerning what she had told the sheriff's deputy who interviewed her. He then intended, if necessary, to impeach her by calling the deputy. He intended to prove the falsity of Melissa's accusation that Lopez had attempted to rape her by asking the jury to infer that the accusation was false because Lopez was not arrested or charged. Defense counsel did not intend to call Lopez to testify and deny the charge.
 The absence of an arrest or formal charge had no tendency in reason to disprove Melissa's accusation. Defense counsel's reasoning depended on being able to argue an improper inference: that law enforcement and prosecution authorities did not believe Melissa's accusation against Lopez, and that therefore the jury should not believe it either. This chain of logic rests on at least two faulty premises: first, that the inability to determine whether a crime occurred as reported by a witness equates to determining that the witness is lying; and second, that the opinion of law enforcement and the prosecution authorities concerning a witnesses' credibility can necessarily, without more, be considered by the jury. Each premise is incorrect on its face. In short, with no proposed showing that Melissa's accusation against Lopez was false, evidence of the accusation was irrelevant on the issue of Melissa's credibility. (See People v. Bittaker (1989) 48 Cal.3d 1046, 1097
["The value of the evidence as impeachment depends upon proof that the prior charges were false"].)
 Even if the evidence were relevant, the trial court properly excluded it under Evidence Code section 352. "As with all relevant evidence . . . the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (People v. Rodriguez
(1999) 20 Cal.4th 1, 9-10.) Based on defense counsel's proposed course of examination, the inference (if any) that Melissa fabricated her charge against Lopez was weak. Undoubtedly, as recognized by the trial court, the matter would devolve into a mini trial involving testimony by Melissa concerning her claim of attempted rape, supplemented by testimony by Charles Stanton that she reported the attempted rape to him. There might also be competing testimony by Elfido Lopez denying the rape (indeed, on this record, testimony by Lopez was the only way defendant could attempt to prove the falsity of the accusation), perhaps supplemented by testimony from Cheryl Moore. The trial court quite properly concluded under Evidence Code section 352 that the probative value of defendant's proposed evidence was substantially outweighed by the probability that it would occasion undue consumption of time and create a substantial danger of confusing the issues and of misleading the jury.
 IV. The Five-Year Enhancement under Section 667, subdivision (a)(1), On Each of the Counts on Which Defendant Was Convicted
 Defendant contends that the trial court erred in imposing a five-year enhancement under section 667, subdivision (a)(1), on each of the two rape counts on which he was convicted. We disagree.
 Defendant was sentenced as a second-strike defendant. On count 1, the court sentenced him to an indeterminate term of 25 years to life (§ 667.61, subds. (a) (e)), which was doubled under the second strike law to 50 years to life. On count 2, the court sentenced him to a determinate term of 8 years, doubled to 16 years under the second strike law, plus a term of 10 years for use of a knife (§ 12022.3, subd. (a)). On each count, the court imposed an additional five years under section 667, subdivision (a)(1), for defendant's prior serious felony conviction.
 In People v. Tassell (1984)36 Cal.3d 77, overruled on an unrelated point in People v.Ewoldt (1994) 7 Cal.4th 380, 401, the California Supreme Court "held that when imposing a determinate
sentence on a recidivist offender convicted of multiple offenses, a trial court is to impose an enhancement for a prior conviction only once to increase the aggregate term, and not separately to increase the principal or subordinate term imposed for each new offense." (People v. Williams (2004)34 Cal.4th 397, 400 (Williams).) In Williams, the California Supreme Court was faced with whetherTassell's holding applied to multiple indeterminate third strike sentences. (Williams, supra,34 Cal.4th at p. 400.) The court reasoned that Tassell was "not controlling or even helpful . . . in this significantly different context" because Tassell relied on Penal Code section 1170.1, which "generally governs the calculation and imposition of a determinate sentence when a defendant has been convicted of more than one felony offense" and does not apply to multiple indeterminate sentences imposed under the Three Strikes law. (Williams, supra, at pp. 402-403.) The court noted that "[t]he Three Strikes law, unlike [Penal Code] section 1170.1, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses, and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense." (Williams, supra, at pp. 404-405.) The court therefore concluded "that, under the Three Strikes law, [Penal Code] section 667(a) enhancements are to be applied individually to each count of a third strike sentence." (Id. at p. 405.) Recently, Division One of the Fourth Appellate District concluded that "a similar analysis" to that employed in Williams applied to a second strike defendant who was not subjected to an indeterminate sentence under the three strikes law, but rather, subject to an indeterminate sentence because of his torture conviction. (People v. Misa (2006) 140 Cal.App.4th 837, 846-847
(Misa).) The appellate court held that "[a]lthough [the defendant] was a second strike defendant rather than a third striker, he is nonetheless a recidivist and . . . is thus subject to a prior conviction enhancement under [Penal Code] section 667, subdivision (a) [on the torture count] even though he also received a similar enhancement relating to the assault count." (Misa, supra, at p. 847.)
 We conclude that the holdings ofWilliams and Misa apply equally to defendant. As in Williams and Misa, defendant received an indeterminate sentence, which is not governed by Penal Code section 1170.1. Moreover, adding the prior serious felony conviction enhancement to his other qualifying offense in a second strike sentence is "consistent with the logic of the Three Strikes law," which "uses a defendant's status as a recidivist to separately increase the punishment foreach new felony conviction." (Williams, supra,34 Cal.4th at p. 404.) Accordingly, there was no error, constitutional or otherwise, in adding the five-year prior serious felony enhancement on each of the two counts on which defendant was convicted.
 V. Cunningham Error
 On count 2, the trial court selected the upper term of eight years (doubled to 16 years under the second strike law) for the rape, and the upper term of 10 years for the knife use allegation. Defendant contends that in choosing these terms, the court violated Cunningham v. California, supra, 549 U.S. ____ [127 S.Ct. 856] by relying on sentencing factors not found by the jury.[8] However, as explained below, the error is harmless.[9]
 In Cunningham, the Supreme Court noted that its prior decisions in, inter alia, Apprendi v. NewJersey (2000) 530 U.S. 466 [147 L.Ed.2d 435,120 S.Ct. 2348] and Blakely v. Washington (2004) 542 U.S. 296
[159 L.Ed.2d 403, 124 S.Ct. 2531] "instruct . . . [that] the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a *Page 1045 sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (Cunningham, supra,549 U.S. at p. 860 [127 S.Ct. at p. 860].) The high court concluded that under California's Determinate Sentencing Law (DSL), the middle term is the statutory maximum sentence. OverrulingPeople v. Black (2005) 35 Cal.4th 1238
[29 Cal.Rptr.3d 740, 113 P.3d 534], the court held that "[b]ecause the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (Cunningham, supra, 549 U.S. at p. ____ [127 S.Ct. at p. 871].)
 However, the failure to submit a sentencing factor to the jury is not structural error requiring reversal per se. (Washington v. Recuenco (2006) 548 U.S. ____ [165 L.Ed.2d 466, 126 S.Ct. 2546].) It is subject to the harmless error test prescribed for federal constitutional error — whether the error was harmless beyond a reasonable doubt (Chapman v. California (1967) 386 U.S. 18, 36
[17 L.Ed.2d 705, 87 S.Ct. 824]). Further, the error was harmless in this case.
 In the instant case, at least two of the sentencing factors considered by the court did not violateCunningham. The court found that "defendant has engaged in a pattern of violent conduct which indicates a serious danger to society." In reaching this finding, the court could properly consider the fact that in September 1994 defendant was convicted of robbery (§ 211) and assault with a firearm (§ 245, subd. (a)(1)), and could also properly consider the jury's findings in the instant case. Undoubtedly, defendant's past and current convictions show "a pattern of violent conduct which indicates a serious danger to society."
 The trial court also relied on the fact that defendant had served a prior prison term. This factor is one on which no jury trial was required, for two independent reasons. First, it falls within the exception for prior convictions. Second, it is a fact admitted by defendant: at trial, defendant testified that in 1994 he was convicted of robbery and assault with a deadly weapon, and that he was released from prison in December 1997.[10] Thus, there was no Cunningham
error in the court's consideration of this factor.
 One valid factor in aggravation is sufficient to support the imposition of an upper term. (People v.Cruz (1995) 38 Cal.App.4th 427, 433-434
[45 Cal.Rptr.2d 148].) Thus, the existence of these two proper sentencing factors supports the imposition of the upper terms for the rape conviction and knife *Page 1046 use on count 2. Further, there is no reasonable possibility that had the court not considered certain other factors in violation of Cunningham, defendant's sentence would have been different. (See People v.Gonzalez (2006) 38 Cal.4th 932, 961, fn. 6 [44 Cal.Rptr.3d 237, 135 P.3d 649] [noting "substantial equivalency" between reasonable possibility and reasonable doubt formulations of harmless error].) Defendant had previously been convicted of two violent offenses. In the instant case, the jury convicted him of two counts of forcible rape (§ 261, subd. (a)(2)), and found true the allegations in each count that he personally used a knife (§ 12022.3, subd. (a)) and that he committed the crimes during the commission of burglary while using a deadly weapon (§ 667.61, subds. (a), (e)). These findings were based on evidence that defendant burglarized Melissa's residence in the early morning hours and forcibly raped Melissa at knifepoint while her infant daughter was asleep in another room. There were no factors in mitigation offered at the sentencing hearing. On such aggravated facts, and with no facts in mitigation, there is no reasonable possibility that the trial court (or any reasonable trial court) would deem the middle or lower terms appropriate for a person with defendant's prior record. Therefore, the Cunningham error is harmless beyond a reasonable doubt.
 DISPOSITION The judgment is affirmed.
[1] Undesignated section references are to the Penal Code.
[2] The jury found not true the allegation in both counts that the burglary was committed with the intent to commit rape (§ 667.61, subds. (a), (d)).
* See footnote, ante, page 1040.
[3] Jury deliberations began at 3:50 p.m. on July 12, 2005, and adjourned for the day at 4:40 p.m. Deliberations resumed at 9:45 a.m. the next day, July 13. Before the requested readback of Melissa and defendant's testimony, the jury had been permitted (at the jury's request) to listen again to the tape recording of Melissa's 911 call, and had received a readback of testimony concerning the red marks on Melissa's neck.
[4] Pursuant to CALJIC No. 17.51, the court instructed: "A juror has been replaced by an alternate juror. You must not consider this fact for any purpose. [¶] The People and the defendant have the right to a verdict reached only after full participation of the twelve jurors who return the verdict. [¶] This right may be assured only if you begin your deliberations again from the beginning. [¶] You must therefore set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place. [¶] You shall now retire to begin anew your deliberations in accordance with all the instructions previously given."
[5] "Under Evidence Code section 782 the admission of evidence of sexual conduct of the alleged victim of a rape offered to attack her credibility is procedurally limited. Section 782 requires that the testimony be preceded by a written motion by the defendant accompanied by an affidavit containing an offer of proof. If the trial court finds that the offer of proof is `sufficient,' it must conduct a hearing out of the presence of the jury and allow the alleged victim to be questioned `"regarding the offer of proof. . . . At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant . . . and is not inadmissible pursuant to Section 352 . . ., the court may make an order stating what evidence may be introduced by the defendant, and the nature of questions to be permitted. The defendant may then offer evidence pursuant to the order of the court."' [Citation.]" (People v. Sims (1976)64 Cal.App.3d 544, 553-554.)
[6] The incidents involved allegations that Melissa exposed her body to maintenance workers at her apartment complex and exposed herself by opening a cape she was wearing one Halloween.
[7] In any event, given our conclusion that defendant's proposed evidence was irrelevant, or that in the alternative was properly excluded under Evidence Code section352, it makes no difference whether the issue is analyzed under Evidence Code section 782. The result is the same: the evidence was properly excluded.
[8] In sentencing on the rape conviction, the trial court cited the following factors: (1) "the planning, sophistication or professionalism with? which the crime was carried out indicates premeditation"; (2) "the defendant has engaged in a pattern of violent conduct which indicates a serious danger to society"; (3) "the crime involved great bodily harm or other acts disclosing a high degree of viciousness or callousness and force"; (4) "the defendant's prior convictions as an adult, established petitions in juvenile detention proceedings [are] numerous and [of] increasing seriousness"; and (5) "the defendant has served a prior prison term." In sentencing on the knife use, the court relied on the fact that the "defendant did not just brandish the knife, but he actually inflicted injury, although not very serious, but injury on the victim's neck because of the pressure he applied to her throat."
[9] Because the error is harmless, this opinion does not reach respondent's contention that defendant's failure to object in the trial court forfeited the issue on appeal.
[10] The probation report shows that he was sentenced to seven years in state prison for those crimes.