Filed 8/24/20  P. v. Chavez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MAYRA ALEJANDRA CHAVEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B297349<br>(Super. Ct. No. 2018005242)<br>(Ventura County) |

Mayra Alejandra Chavez appeals from the judgment after a jury convicted her of torture (Pen. Code,[1] § 206), assault on a child causing death (§ 273ab, subd. (a)), and second degree murder (§§ 187, subd. (a), 189, subd. (b)).  The trial court sentenced her to life in state prison on the torture conviction; a consecutive 25 years to life on the assault; and 15 years to life on the murder, to be served consecutively to the sentence on the torture conviction but concurrently with the sentence on the

---

[1] All statutory references are to the Penal Code.

assault.  Chavez contends:  (1) the judgment should be reversed due to the erroneous admission of cadaver dog scent evidence, (2) her torture conviction should be reversed because of insufficient evidence, and (3) the sentence on her murder conviction should be stayed.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

*Chavez tortures K.L. for over two years*

In June 2012, Chavez gave birth to a daughter, K.L., who tested positive for methamphetamine and marijuana. Chavez was dating K.L.'s father, Omar Lopez, at the time.[2] Chavez had an older daughter, N.C., when K.L. was born.  Lopez was not N.C.'s father.

A few days after her birth, Ventura County Child and Family Services (CFS) took custody of K.L. and placed her in a foster home.  She was reunified with her mother in February 2013.  Within days of reunification, Chavez began to abuse K.L. She slapped her at nearly every meal, claiming she did not eat fast enough.  She pushed K.L. off a bed once because she thought it would be funny.

Lopez began a three-month-long work furlough program in July.  Chavez relapsed on methamphetamine and heroin while he was away.  At some point during that time, Chavez's stepsister saw Chavez drop K.L. into a crib and throw a blanket and pillow over her face.  The stepsister told Chavez to remove the items so K.L. did not suffocate, but Chavez said that she did not care.  Chavez also said that she thought K.L. was

---

[2] Lopez pled guilty to child endangerment (§ 273a, subd. (a)) and perjury (§ 118, subd. (a)) in exchange for a 14-year prison sentence, the dismissal of a second degree murder charge, and his testimony against Chavez.

2

"annoying" and "ugly." The stepsister noticed that K.L. had scabs and bruises on her face. N.C. did not have similar injuries.

In September, an anonymous tipster reported K.L.'s injuries to CFS. A social worker went to Chavez's house and saw that K.L. was significantly underweight. She had bruises, abrasions, bite marks, and burns all over her body. Chavez told the social worker that she did not know the source of her daughter's injuries, but that K.L. was "always hurting herself." N.C. had no comparable injuries.

Police conducted a physical abuse investigation at the social worker's request. A detective examined K.L. and photographed her injuries. During an interview, Chavez told the detective that K.L. fell down a lot. Her bruises may have been from slipping in the bathtub or a seatbelt that pinched her stomach.

The detective was concerned for K.L.'s safety, and granted CFS authority to remove her and N.C. from Chavez's care. After the girls' removal, Chavez called the social worker and reiterated the explanations for K.L.'s bruises she had given the detective. She also claimed that another child had hurt K.L. on the playground.

A pediatrician later examined K.L. He documented injuries all over her body. Given their large number and unusual locations, the pediatrician believed K.L. was a victim of child abuse. She had also failed to gain any weight in the previous six months, which was unusual for such a young child.

In October, another CFS social worker interviewed Chavez. Chavez again denied hurting her daughter, and repeated her claims about the seatbelt injuring K.L.'s stomach and K.L. slipping in the bathtub. She said K.L. injured her

fingers by slamming them in a dresser door.  Chavez said she did not seek out medical attention for K.L. because she was afraid of losing her daughters.  She admitted that she loved N.C. more than she loved K.L., but said she wanted to regain custody of both daughters.

In August 2014, Lopez told the CFS social worker—falsely—that N.C. and K.L. were in his sole care.  He also claimed—again, falsely—that his relationship with Chavez had ended.  In actuality, Chavez was living with Lopez and her daughters, despite CFS orders against doing so.

In September, a third social worker asked Chavez about the child abuse allegations made against her.  Chavez said that she felt "horrible for everything that happened" and did not "want to be that type of mom."  She expressed remorse for K.L.'s injuries, and said that she had learned how to discipline her daughter appropriately.  She wanted to reunify with her family.

Despite these claims, Chavez's abuse of K.L. intensified throughout the latter part of 2014.  Once or twice each day, she made K.L. stand in the corner for three or four hours with a beanie covering her face.  She forced K.L. to drink hot sauce.  She beat K.L. with her hands, shoes, or a spatula.  She poked K.L.'s eyes with her fingers, and hit her in the face or chest at almost every meal.  She regularly forced K.L. to bathe in cold water, and would often pull a beanie down over her eyes and run water over her covered head.

Lopez tried to prevent Chavez's abuse only once, when he stopped her from pulling K.L.'s hair.  Chavez grew angry and threw a jar that hit K.L. in the head, causing her to bleed.  Chavez just laughed.  Lopez did not intervene again

4

because he feared CFS would get involved.  He also thought his intervention would cause Chavez to hurt K.L. more severely.

In February 2015, another CFS social worker met with Chavez and Lopez.  Lopez told the social worker that he could care for N.C. and K.L. without supervision.  Chavez claimed that she wanted to visit her daughters every day.  She also said she rarely disciplined her daughters, and only used short timeouts when she did.

By April or May, Chavez and Lopez were both using methamphetamine.  Sometime in mid-June, Lopez left the house for several hours.  When he returned, he saw that half of K.L.'s face was bruised.  He and Chavez did not seek medical treatment for K.L. because they were afraid that CFS would take N.C. away.

*Chavez murders K.L.*

In late June, Chavez returned home around noon one day and noticed that three-year-old K.L. had soiled her diaper.  Chavez yanked K.L.'s pants down and pulled her feet out from under her.  That caused K.L. to flip backward and slam her head on the floor.  K.L.'s head made a loud crunching noise when it hit, but she neither cried nor had any visible injury.  Chavez was unconcerned, and finished changing her daughter's diaper.

A half-hour later, K.L. yelled "Mommy!" and fell to the floor.  She began to seize, went stiff, and struggled to breathe.  The seizure lasted about 30 seconds.  K.L. was able to walk and talk after it ended, so Chavez and Lopez assumed she was fine.

K.L. had a second seizure around 45 minutes later.  She again went stiff and struggled to breathe.  This seizure lasted longer than the first, about 90 seconds.  After it ended, K.L.'s body felt like "Jell-O basically, soft," and she was unable to

walk or talk.  Chavez and Lopez nevertheless decided against seeking medical attention, afraid of losing N.C.

Chavez and Lopez wrapped K.L. in a blanket and hoped she would go to sleep.  Red fluid leaked from her nose.  Around 10:00 that evening, K.L. was breathing on her own, but her body still felt like Jell-O.  Chavez and Lopez went to sleep.

At 3:00 a.m., Lopez woke to check on K.L.  She was not breathing.  Her body was stiff and she did not have a heartbeat.  Lopez woke Chavez and told her that their daughter was dead.

*Chavez disposes of K.L.'s body in Mexico*

At 4:00 a.m., Lopez went to Chavez's mother's house and told her that K.L. had died.  Chavez's mother told him to go to Mexico.  She lent him her Chrysler and $300.

Lopez went home and put his daughter's lifeless body on the floor behind the driver's seat in the Chrysler.  He put clothing around K.L to make it look like he was carrying a bag of laundry.  He and Chavez then departed for Mexico.

Shortly before reaching the border, Lopez moved K.L.'s body from the floor of the car to her car seat.  He had to apply pressure at the waist and knees to reconfigure her stiff body into the car seat.  Her body had already begun to smell and decay.

Chavez and Lopez crossed the Mexican border around 9:00 a.m., and spent the next 10 or 12 hours looking for a secluded spot to bury K.L.  When they found one, they put her body in a plastic bag and dug a shallow grave.  They put the bag into the grave and covered it with dirt and plants.

After burying their daughter, Chavez and Lopez went to a Tijuana bar and drank.  They crossed the border again a

week later, still driving the Chrysler.  They returned to their house, gathered their belongings, and moved in with Chavez's mother.  She told them that they should have burned the car.

Chavez and Lopez drove back to K.L.'s burial site in late July, again in her mother's Chrysler.  They retrieved K.L.'s body, put it in the car, and drove to a house in Tijuana.  There, the two stripped the decaying flesh from K.L.'s bones and tried to dissolve it in bleach.  They then broke the bones into small pieces, scattered them around Tijuana, and returned to Oxnard.  Chavez thereafter referred to K.L. as "the little bitch."

*Cadaver dogs search for K.L.*

Over the next two years, Chavez and Lopez repeatedly lied about K.L.'s whereabouts.  In late June 2017, an Oxnard detective arranged for three cadaver dogs to search the Chrysler for the scent of human remains.  Two of the dogs alerted to the presence of human remains in the area behind the driver's seat.  The third dog showed interest in that area, but did not give a definitive response.

*Chavez admits K.L. is dead*

In August, Oxnard detectives interviewed Chavez.  She admitted that K.L. was with her and Lopez when they drove to Tijuana in June 2015.  Chavez said they left K.L. on the street there and returned to Oxnard.

Chavez subsequently admitted that K.L. was not alive when she and Lopez took her to Tijuana.  She said that K.L. had fallen off a bed and had a series of seizures.  Chavez thought that she would be fine and did not take her to the hospital.

Police later recorded a conversation between Chavez and Lopez.  During the conversation, Chavez said that she had told police that K.L. had died, but did not tell them that she hit

7

her head while Chavez was changing her diaper. Chavez instructed Lopez not to tell the "diaper part" to police. Lopez ignored this instruction and told police.

Detectives reinterviewed Chavez after Lopez told them about K.L.'s cause of death. Chavez told the detectives that she was changing K.L.'s diaper when she fell back and had a seizure. Chavez claimed that the fall was an accident, and that she did not know what caused it. She admitted, however, that she did not seek medical attention for K.L. because she thought that CFS would take custody of N.C. if she did. She also admitted that she and Lopez scattered K.L.'s remains outside Tijuana after her death.

## DISCUSSION

### *Cadaver dog scent evidence*

Chavez contends we should reverse the judgment because the trial court prejudicially erred when it admitted "unreliable" cadaver dog scent evidence. We disagree.

#### *1. Relevant proceedings*

Prior to trial, Chavez moved to exclude the cadaver dog scent evidence as not accepted in the scientific community under the standards of *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*). The trial court told Chavez that dog scent evidence was not subject to *Kelly*, but instead fell within the framework of *People v. Malgren* (1983) 139 Cal.App.3d 234 (*Malgren*). Chavez moved to exclude the evidence under *Malgren*, specifically citing the fifth factor (staleness).[3] Because the dogs did not search her mother's Chrysler until June 2017—two years after K.L.'s death—she argued the evidence was too stale and unreliable to be admitted.

---

[3] Chavez did not contest any of the other *Malgren* factors.

8

The trial court disagreed and admitted the evidence. It concluded that the two-year delay between K.L.'s death and the search did not render the evidence inadmissible: Satisfying the first four *Malgren* factors satisfied the fifth, as a qualified and reliable dog would not alert to human remains if the scent was stale or contaminated. Moreover, there was no evidence that any other item that had been in the Chrysler would have caused the dogs to alert their handlers to the scent of human remains.

One of the handlers testified at Chavez's trial. After her testimony, the parties agreed there was no need for an instruction on the dog scent evidence. During closing arguments, defense counsel conceded that Chavez and Lopez transported K.L.'s dead body to Mexico in the Chrysler.

In a new trial motion, Chavez argued the trial court erred when it admitted the cadaver dog scent evidence since there was no scientific support for this evidence under *Kelly*. The court denied the motion, again noting that *Kelly* does not apply to such evidence.

### 2. Kelly *challenge*

Chavez first asserts the trial court erred when it failed to conduct a *Kelly* hearing before it admitted the cadaver dog scent evidence. But as that court noted, *Kelly* does not apply to this type of evidence. (*People v. Jackson* (2016) 1 Cal.5th 269, 316-317, 320 (*Jackson*).) *Malgren* sets forth the foundational requirements for the admission of such evidence. (*People v. Westerfield* (2019) 6 Cal.5th 632, 705-706.)

9

### *3.* Malgren *challenge*

Chavez alternatively asserts that the evidence did not qualify for admission under *Malgren*.[4]

Before a trial court can admit cadaver dog scent evidence, five preliminary facts must be established:  (1) the dog's handler must be "qualified by training and experience to use the dog," (2) the dog must be "adequately trained," (3) the dog must be reliable, (4) the dog must be "placed on the track where circumstances indicated the guilty party [may] have been," and (5) the scent must not have "become stale or contaminated." (*Malgren, supra,* 139 Cal.App.3d at p. 238.)  Where, as here, "'the relevance of proffered evidence depends [on] the existence of a preliminary fact, the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence.'  [Citation.]" (*Jackson, supra,* 1 Cal.5th at p. 321.)  "'We review the trial court's conclusions regarding [preliminary] facts for substantial evidence,'" and its "'ultimate ruling [on the evidence's admissibility] for . . . abuse of discretion.'"  (*Id.* at pp. 320-321.)  We will reverse that ruling only if the court "'"exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'  [Citation.]'  [Citation.]"  (*Id.* at p. 321; see also *People v. Marks* (2003) 31 Cal.4th 197, 226-227 ["reasonable probability" standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), applies to the erroneous admission of evidence].)

_____

[4] Though Chavez asserts the evidence did not meet several *Malgren* requirements, we consider only her challenge to the fifth requirement since that was the only challenge advanced at trial. (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)

There was no abuse of discretion here. The fifth *Malgren* requirement "is not an independent requirement" and can instead be "satisfied by evidence that establishes the other four." (*Jackson, supra*, 1 Cal.5th at p. 325.) "[T]he relevant question is not . . . whether the scent is 'stale' or 'contaminated,' but whether a well-trained dog is able to alert its handler that it is unable to discern a particular scent from the scent item or that the scent on the scent item does not have a trail." (*Id.* at p. 324.)

Here, prior to trial, Chavez did not challenge the qualifications of the handler of the two dogs who alerted to K.L.'s remains, the training or reliability of those dogs, or that the circumstances indicated that Chavez and K.L.'s remains had been in the Chrysler. The trial court could thus rationally conclude that the fifth *Malgren* requirement was satisfied since reliable, well trained dogs would not have alerted to a scent that was not present.

Moreover, there was evidence from which the trial court could rationally infer that the scent of K.L.'s remains had not grown stale or become contaminated. K.L.'s lifeless body was in the Chrysler for more than 15 hours while Chavez and Lopez drove to Tijuana and searched for a place to bury her. Her body was already decaying and beginning to smell during this trip. K.L.'s body was in the car again the following month, after Chavez and Lopez excavated her remains and took them to a Tijuana house. It had decayed even further by this time. Thus even if the fifth *Malgren* requirement were independent of the other four, there was sufficient evidence to uphold the trial court's determination that it was satisfied here.

But even if it were not, reversal would not be required since there is no "reasonable probability" that the jury

11

would have reached a different verdict if the cadaver dog scent evidence had not been admitted. The dog scent evidence was not "among the most damning pieces of evidence" offered at trial, as Chavez characterizes it. In an interview with police, Chavez admitted that K.L. was in the Chrysler when she and Lopez drove to Tijuana in June 2015. She later admitted that K.L. was dead when they made the trip. And she admitted that she and Lopez were in the Chrysler when they scattered K.L.'s remains around Tijuana in July.

The evidence proffered at trial corroborated Chavez's admissions. Lopez confirmed all of Chavez's admissions, including that they used the Chrysler to transport K.L.'s dead body over the border. Border crossing evidence confirmed Lopez's testimony and Chavez's admission, showing the Chrysler crossing back into the United States a week after K.L.'s burial. In light of this evidence, defense counsel conceded during closing arguments that Chavez and Lopez used the Chrysler to transport K.L.'s body to Mexico. Chavez provides no good reason to reject that concession now. There is no reasonable probability that the jury would have reached different verdicts if the cadaver dog scent evidence had not been admitted. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

*Sufficiency of evidence of torture*

Chavez next contends her torture conviction should be reversed because prosecutors presented insufficient evidence that she specifically intended to cause extreme pain and suffering for some sadistic purpose. We again disagree.

A torture conviction requires proof that the defendant: (1) inflicted great bodily injury on another person, and (2) "did so with specific intent to cause cruel and extreme

12

pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223; see § 206.) Whether Chavez intended to cause extreme pain and suffering for some sadistic purpose is a question of fact. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.) Our review is thus limited to determining whether substantial evidence—"evidence that is reasonable, credible, and of solid value"—supports the jury's verdict. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

"Intent is rarely susceptible of direct proof," however, and must instead "be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420 (*Pre*).) But the same standard of review applies. (*People v. Valencia* (2008) 43 Cal.4th 268, 289.) We view the evidence "in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) Reversal is warranted only if "'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*Ibid.*)

Substantial evidence supports the jury's determination that Chavez intended to cause extreme pain and suffering for some sadistic purpose. Chavez began to inflict injuries on K.L. almost immediately after she gained custody of her daughter, when K.L. was just eight months old. She slapped K.L. at mealtimes. She bruised, scratched, bit, and burned K.L. She made K.L. stand for hours with her face covered. She forced her to drink hot sauce, poked her in the eyes, and hit her in the face and chest. And at bathtime she would waterboard her daughter. Such a horrific course of conduct, extending over a

13

period of more than two years, provided circumstantial evidence of Chavez's intent to torture her daughter. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.) That such conduct can be distinguished from other cases upholding torture convictions is irrelevant: "[A] comparison to the facts in other cases is of little value in assessing the sufficiency of the evidence in a particular case." (*Pre, supra*, 117 Cal.App.4th at p. 423.)

The sheer number of injuries Chavez inflicted also provided circumstantial evidence of Chavez's intent to torture. K.L. had bruises, abrasions, scratches, bite marks, and burns all over her body. She had scabs and scars on her face, and chunks of hair missing from her scalp. Her fingers and toes had been smashed. These extensive injuries provided the jury with circumstantial evidence of Chavez's intent to torture. (*People v. Chatman* (2006) 38 Cal.4th 344, 390-391 [scores of wounds on unresisting victim is evidence of intent to torture]; *People v. Crittenden* (1994) 9 Cal.4th 83, 141 [multiple nonfatal wounds is consistent with intent to torture].)

Chavez's callous attitude toward K.L.'s injuries provided further evidence of her torturous intent. Soon after reunification Chavez laughed after she pushed K.L. off the bed. She laughed again when she hit K.L. in the head with a jar and caused her to bleed. She told her stepsister that she didn't care if K.L. suffocated. She called K.L. an "annoying" and "ugly" "little bitch" and said she did not love her. And perhaps most significantly, she regularly neglected to seek medical attention for K.L., afraid of losing N.C., the daughter she did purportedly love. Such indifference provided the jury with additional circumstantial evidence of Chavez's intent to cause extreme pain

14

and suffering for some sadistic purpose.  (*People v. Misa* (2006) 140 Cal.App.4th 837, 843-844 [indifference to victim's medical needs is evidence of intent to torture].)

*Punishment for assault and murder*

Finally, Chavez contends the trial court should have stayed the sentence on her murder conviction because that offense was indivisible from her assault on a child causing death. We are not persuaded.

"An act . . . that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  This prevents a defendant from being punished for multiple offenses that are committed during "a course of conduct deemed to be indivisible in time."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

"""""Whether a course of criminal conduct is divisible[,] and therefore gives rise to more than one act within the meaning of section 654[,] depends on the intent and objective of the actor."""""  (*Jackson, supra*, 1 Cal.5th at p. 354.)  If all of the offenses were "merely incidental to" a single objective, or were all "the means of accomplishing or facilitating" that objective, the defendant "may be found to have harbored a single intent and . . . may be punished only once."  (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).)  But if the defendant "harbored 'multiple criminal objectives' [that] were independent of and not merely incidental to each other, [they] may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]"  (*Ibid.*)

15

"Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*Jackson*, *supra*, 1 Cal.5th at p. 354.) We will uphold the court's determination that Chavez had separate intents and objectives when assaulting and murdering her daughter if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

Chavez's assault conviction was based on pulling K.L.'s pants down, grabbing her feet, and flipping her backward, which caused K.L. to smash her head on the floor and ultimately die. Chavez's murder conviction was based on her failure to seek medical treatment for K.L. after the assault, despite her daughter enduring a series of seizures and difficulty breathing. At sentencing, the trial court found that Chavez's intent was to punish and inflict pain on K.L. during the assault. In contrast, it found that "self-preservation and a fear of losing . . . [N.C.]" motivated Chavez to refrain from seeking medical treatment for K.L. Substantial evidence supports these findings. Punishing Chavez for both the assault and the murder was thus proper. (*Harrison*, *supra*, 48 Cal.3d at p. 335.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

TANGEMAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

16

Derek D. Malan, Judge

Superior Court County of Ventura

_____

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.