Filed 7/17/25  P. v. Meza CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063579 |
| v. | (Super. Ct. No. SWF1907551) |
| CRISTIAN GABRIEL MEZA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Stephen J. Gallon, Judge. Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin

Urbanski and Anastasia Sagorsky, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

Defendant Cristian Gabriel Meza participated with other gang members in restraining and beating Frery Coronel, a fellow gang member. Meza later transported Coronel to a remote location, where he repeatedly stabbed and choked Coronel to death. A jury convicted Meza of first degree murder and found true kidnapping and torture special circumstance allegations.

Meza argues the evidence adduced at trial was insufficient to support the jury's finding as to the torture special circumstance because the prosecution failed to prove he acted with the specific intent to cause cruel or extreme pain and suffering. We conclude the evidence was sufficient to support the torture special circumstance finding and affirm the conviction.

FACTUAL AND PROCEDURAL BACKGROUND

I.

FACTUAL STATEMENT

A. *Planning of Physical Assault of Coronel*

Dean Marcum, a former member of Elsinore Vatos Locos (EVL), visited Victor Lindzy's home in Lake Elsinore. Robert Camacho lived next door and was at Lindzy's home when Marcum arrived.

Marcum was told to stay at Lindzy's home until someone named "Wino" called Camacho's phone. Marcum had never met Wino and did not know his real name. Meza, who went by the nickname "Cartoon," eventually arrived at Lindzy's home. Marcum did not know Meza's real name but knew he was a member of the Elsinore Young Classics (EYC) gang. Camacho and Lindzy were also associated with EYC.

2

Wino, a member of EYC, later spoke to Marcum by telephone from prison, asking Marcum to do him a favor by taking part in disciplining one of Wino's fellow EYC gang members. Marcum understood "discipline" to mean that, when a gang member steps out of line, three or four fellow gang members would physically assault the person. Marcum refused.

B. *The Assault*

Fifteen to 20 people were at Lindzy's by early evening. Marcum heard loud noises coming from the garage. He knew Camacho and Meza were in the garage but did not know who else was in there. Another witness who was in Lindzy's garage saw four people enter the garage, escorting Coronel, whom they immediately began hitting. They struck Coronel repeatedly with fists on his chest and head. Coronel stood up at first but then sat in a chair. He was whimpering and crying, saying, "I didn't do shit to you." The attack continued for 20 minutes, during which time Coronel was beaten severely.

Lindzy, who was with Marcum in the house, became upset about the noise and said not to assault the man at his home. After the noise stopped, Marcum looked into the garage, where he saw Coronel get up off the floor and sit on a barstool. Coronel appeared coherent and did not look badly beaten. Marcum left Lindzy's house to go to a friend's home.

A few hours after leaving Lindzy's house, Marcum received several calls from Camacho, who demanded he return to Camacho's house. During one of the calls, Marcum heard some noise in the background. Camacho told Marcum he needed to "come give Husky a ride out of here." Marcum understood "Husky" to be the person being beaten in Lindzy's garage. Marcum refused and ended the call.

C. *Transporting Coronel*

While at his friend's home, Marcum saw his acquaintances Tyrone Jones and Melissa Unger sitting in Jones's car. Jones and Unger were not members of EYC or EVL. Marcum asked Jones and Unger if they would help him by giving Coronel a ride home or to the hospital from Lindzy's house. Marcum told Unger and Jones, who were methamphetamine users, he would give them drugs when they returned. They agreed.

When Jones pulled up to Lindzy's house, he saw Camacho and Alejandro Villegas in the driveway. Jones knew Villegas, who was a member of EYC. Jones told them he was there to pick someone up and take him to the hospital. Camacho said, "'This guy's not going to the hospital.'" He needs to "'be gone.'"

Jones heard banging sounds and screaming coming from the garage. The garage door opened, and Jones saw Coronel chained to a chair with a metal chain. He was conscious but badly beaten, with blood on his face, head, and sweater. His face appeared swollen and discolored.

Meza, his sister, and Lindzy were also present. At Camacho's instruction, Lindzy left the garage and returned with a gun. Camacho told Jones they were to take Coronel to the mountains off Ortega Highway.

Meza and Villegas helped Coronel, who was chained, walk to Jones's car. They were helping Coronel walk and also pulling him by the chain. Meza got into the car and pulled Coronel into the back seat by the chain. Jones drove the car with Unger in the front passenger seat.

During the drive, Coronel said to Meza, "'Why are you doing this to me? I've never done anything wrong to you. I've known you forever.'" Meza replied, "'This is your Uber driver.'" While driving on Ortega Highway before reaching the Orange County border, Unger became upset because she wore

4

an ankle monitor which would alert probation if she left Riverside County. Jones made a U-turn and stopped the car in a turnout in an unpopulated area.

D. *Coronel's Murder*

Meza told Jones, "'This is a big guy. He needs help.'" Jones refused to help Meza or get out of the car, even though Meza was holding a knife. Meza ordered Unger to get out of the car and help him.

Meza said something to Jones about DNA and needing to get rid of the clothes. After Meza used the knife to cut off Coronel's shirt and sweater, he put them on the floor of the car, leaving Coronel's pants on. Coronel was still alive, moaning and making noise. However, he seemed to be "out of it" and was not alert.

Meza dragged Coronel out of the car. Coronel did not seem to want to get out and did not go willingly. Jones now thought Coronel might be dead because he fell out of the car and hit the ground. Meza ordered Unger to help, and they began dragging Coronel away from the car by his feet to a ravine about 30 to 40 yards from the turnout.

While Meza and Unger were gone, Jones heard a scream. Unger returned to the car, crying and hysterical. Meza then returned, and they both got back into the car. Meza said, "'I hope I stabbed him enough because he wouldn't die.'"

Jones drove Meza and Unger back to their friend's house. When Jones returned to his car, he found Coronel's bloody clothes, a bloody Milwaukee brand knife, and a large chain in the backseat.

E. *Discovery of Coronel's Body*

The day after the murder, a hunter discovered Coronel's body in a ravine off Ortega Highway near Lake Elsinore. Coronel's body was bloody,

and his pants were pulled down to the knees. Coronel had abrasions, lacerations, signs of strangulation, and 21 stab wounds to the neck and back. There was a zip tie on his left wrist. His wallet and identification were found in his pocket.

F. *Coronel's Autopsy*

A forensic pathologist determined the cause of Coronel's death was multiple sharp and blunt force injuries. Coronel had also suffered significant blood loss. Coronel had 21 individual stab wounds. He had 19 stab wounds ranging from 3/4 of an inch to 2 1/4 inches, located on his neck, back, armpit, arms, and hip, which would have caused considerable pain.

Two additional stab wounds were more serious and could have caused death. One wound travelled through a large muscle in Coronel's neck, through his jugular vein, and then punctured his carotid artery. The second wound was to Coronel's diaphragm and liver. The pathologist could not determine the order of the infliction of the wounds. Coronel's body also showed signs of strangulation, including marks around the neck and ruptured blood vessels in the right eye.

Coronel suffered multiple additional injuries, including abrasions on the bridge of his nose and purple swelling and bruising to his right eye; scrapes or abrasions on his chin; abrasions on his neck; significant damage to the inside of his mouth from the teeth lacerating his lip; bruising on the forehead; abrasions and scrapes on the left hip; abrasions and scrapes consistent with being dragged while still alive on the legs and thighs; abrasions on the left chest, flank, and armpit; bruises on the inner thighs and backs of the legs; puncture marks consistent with defensive wounds on the hands; 10 large lacerations and hemorrhaging to the scalp; scrapes and lacerations on his back and to his front hairline; and 4 to 5 lacerations and

6

hemorrhaging to the back of the head, consistent with blunt force trauma. In addition, rocks, twigs, and debris covered Coronel's body. The pathologist recovered a zip tie from his left wrist.

## II.

## PROCEDURAL HISTORY

Meza was charged with six codefendants, including his sister, Camacho, Lindzy, Villegas, Unger, and Jones. Unger and Jones both pleaded guilty to voluntary manslaughter and received reduced sentences in exchange for their testimony at Meza's trial. Marcum pleaded guilty to acting as an accessory after the fact and also testified at trial.

Meza's trial was severed from the other codefendants' trial. A jury found Meza guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and also found true special circumstances allegations of torture–murder (§ 190.2, subd. (a)(18)) and kidnapping (§ 190.2, subd. (a)(17)(B)). The trial court sentenced Meza to life in prison without the possibility of parole.

## DISCUSSION

Meza argues the evidence was insufficient to support the torture special circumstance allegation. We conclude the evidence was sufficient to find Meza acted with the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge.

## I.

## BACKGROUND

*A. Allegation and Instruction*

The trial court instructed the jury with CALCRIM No. 733 on the special circumstance allegation of torture–murder:

---

[1] All further statutory references are to the Penal Code.

"The defendant is charged with the special circumstance of murder involving the infliction of torture. [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intended to kill Frery Coronel; [¶] 2. The defendant also intended to inflict extreme physical pain and suffering on Frery Coronel while that person was still alive; [¶] 3. The defendant intended to inflict such pain and suffering on Frery Coronel for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; [¶] AND [¶] 4. The defendant did an act involving the infliction of extreme physical pain and suffering on Frery Coronel. [¶] There is no requirement that the person killed be aware of the pain."

B. *Legal Standard*

"The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true . . . the murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18)).

"To prove a torture–murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citation.] The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body." (*People v. Streeter* (2012) 54 Cal.4th 205, 237.) "'There is no requirement that the victim be aware of the pain.'" (*People v. Elliot* (2005) 37 Cal.4th 453, 466–467.) The sufficiency inquiry is directed at evidence of the defendant's torturous intent. (*People v. Mincey* (1992) 2 Cal.4th 408, 433.)

8

"[T]he trier of fact may find intent to torture based on *all* the circumstances surrounding the charged crime, including the nature and severity of the victim's wounds and any statements by the defendant revealing his state of mind during the crime." (*People v. Bemore* (2000) 22 Cal.4th 809, 841.) Evidence the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite "'sadistic intent to cause the victim to suffer pain in addition to the pain of death.'" (*Ibid.*); see *id.* at p. 844 ["Certain nonlethal knife wounds . . . seem plainly calculated to cause extreme pain and to induce [the victim's] cooperation"].) Intentional nonfatal injuries "are consistent only with an intent to inflict extreme pain." (*People v. Crittenden* (1994) 9 Cal.4th 83, 141 (*Crittenden*).)

Although evidence of binding, by itself, is insufficient to establish an intent to torture (*People v. Mungia* (2008) 44 Cal.4th 1101, 1138), it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence. (*Crittenden*, *supra*, 9 Cal.4th at p. 141.) Finally, the manner of the victim's death may also be evidence of the defendant's intent to torture. (*People v. Proctor* (1992) 4 Cal.4th 499, 531–532 (*Proctor*).)

C.  *Standard of Review*

"""""[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""""" (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) The standard is the same under the state and federal due process clauses. (*People v. Rowland* (1992) 4 Cal.4th 238, 269.) "We presume "'in support of the judgment the existence of every fact the trier [of fact] could reasonably

9

deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved."' (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.) We must accept logical inferences the jury might have drawn from that evidence. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Unless it is clearly shown that "'on no hypothesis whatever is there sufficient substantial evidence to support the verdict,' the conviction will not be reversed." (*People v. Misa* (2006) 140 Cal.App.4th 837, 842.)

## II.

## ANALYSIS

Considered as a whole, the circumstances surrounding Coronel's murder provide sufficient evidence of Meza's torturous intent. Significantly, there was medical evidence showing Coronel suffered a large number of nonlethal wounds prior to his death, including 19 nonfatal stab wounds on his neck, back, armpit, arms, and hip, which would have caused considerable pain. (*Proctor*, *supra*, 4 Cal.4th at p. 531 [torture–murder special circumstance affirmed where defendant severely beat the victim and inflicted a series of nonfatal "incision–type stab wounds to her neck, chest, and breast area" before strangling her].)

Additionally, Coronel had multiple other types of injuries, including abrasions, bruising and swelling, and lacerations to his face, neck, mouth, forehead, hip, chest, head, and armpit. Notably, he had abrasions and scrapes on his legs and thighs which were consistent with being dragged by his feet while still alive, as well as defensive puncture marks on his hands. He had additional fatal wounds caused by strangulation, including marks on his neck and petechial hemorrhaging, as well as two fatal stab wounds to the carotid artery in his neck and to his diaphragm and liver. These wounds demonstrate "deliberate and gratuitous violence beyond that which was

10

necessary to kill the victim." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1188 (*Hajek and Vo*), overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Thus, the jury could reasonably infer from the circumstances that the wounds were inflicted to cause Coronel severe pain.

There was also substantial evidence Coronel had been bound and isolated. Jones and Unger both testified that they witnessed Coronel chained or tied to a chair. They also testified Meza pulled Coronel by the chain to force him into the back of Jones's car. Coronel was also isolated and thus unable to seek help when he was taken to a remote area in the mountains, where Meza strangled and stabbed him to death. (See *Crittenden*, *supra*, 9 Cal.4th at p. 141 [sufficient evidence of intent to torture where, inter alia, victim was bound to a chair and received repeated superficial stab wounds].)

Further, the evidence adduced at trial demonstrated Coronel's murder was motivated by revenge. Wino, an EYC gang member, ordered several other members, including Meza, to "discipline" Coronel, a fellow EYC gang member, by means of a physical assault. The evidence showed Coronel was repeatedly beaten in Lindzy's garage for at least 20 minutes. This physical assault continued when Meza took a chained Coronel into the mountains, where he dragged Coronel by his feet into a ravine and repeatedly stabbed and strangled him. Jones testified he heard screaming from the ravine, which demonstrates Coronel was still alive while Meza was attacking him. From this evidence, a reasonable trier of fact could infer that in beating, stabbing, and strangling Coronel, Meza was motivated by a desire to punish him in retribution for some perceived wrong done to the EYC gang. (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1189 [sufficient evidence adduced at trial to demonstrate that torture–murder of grandmother was motivated by intent to get revenge on granddaughter with whom defendants had recent verbal

11

altercation].) Moreover, the fact that Coronel's wallet was found on his body supports the jury's determination that revenge, as opposed to theft, was the motivation for Coronel's death.

Meza argues this evidence does not support an inference that he himself acted with the intent to inflict extreme pain on Coronel for purposes of revenge. We disagree. The totality of the circumstances demonstrates Meza intended to cause Coronel extreme pain. The vast number of nonlethal stab wounds evidences a sadistic intent to cause suffering. Meza himself stated, "'I hope I stabbed him enough, because he wouldn't die.'" Additionally, dragging Coronel by the legs into a ravine evidences an intent to cause extreme pain. Although Meza could have killed Coronel quickly by means of Lindzy's gun or a fatal knife wound, he chose instead to inflict numerous and extremely painful nonfatal injuries over a prolonged period. From this evidence, a reasonable trier of fact could infer Meza intended to cause Coronel extreme pain and was motivated by a desire for revenge against Coronel for his alleged transgressions against the EYC gang.

## DISPOSITION

The judgment is affirmed.


DELANEY, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J.

12