Filed 2/5/15  P. v. Santana CA5

<u>NOT TO BE PUBLISHED IN OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAMIRO SANTANA, JR.,<br><br>    Defendant and Appellant. | F066525<br><br>(Super. Ct. No. F11904674)<br><br>**OPINION** |

-ooOoo-

## <u>THE COURT</u>*

APPEAL from a judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

Rita Barker, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine B. Chatman and Chung Mi (Alexa) Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Gomes, Acting P.J., Poochigian, J., and Detjen, J.

Appellant, Ramiro Santana, Jr., pled no contest to voluntary manslaughter (count 1/Pen. Code, § 192, subd. (a))**1** and assault with a deadly weapon (count 2/§ 245, subd. (a)(1)) and admitted a personal use of a knife enhancement in count 1 (§ 12022, subd. (b)(1)).  In a separate proceeding the court found true a gang enhancement in count 1 (§ 186.22, subd. (b)(1)).

On January 18, 2013, the court sentenced Santana to prison for an aggregate term of 22 years:  the upper term of 11 years on his voluntary manslaughter conviction, a one-year term for the use of a knife enhancement in that count, a 10-year gang enhancement in that count, and a concurrent upper term of four years on his assault conviction.

On appeal, Santana contends the evidence is insufficient to sustain the court's true finding on the gang enhancement.  We affirm.

## FACTS

On March 25, 2011, at approximately 2:15 p.m. on Kings Canyon Road in Fresno, Sebastian Cruz, Juan Lopez, and 17-year-old Santana, became involved in a fight with Junior Villarreal and Juan Garcia.  During the fight, Santana pulled out a knife and stabbed Villarreal in the chest, mortally wounding him.

On March 6, 2012, the district attorney filed a first amended complaint charging Santana with the murder of Villarreal (count 1/§ 187, subd. (a)), the assault with a deadly weapon of Garcia (count 2), street terrorism (count 3/§ 186.22, subd. (a)), a personal use of a knife enhancement in count 1, and a gang enhancement in counts 1 and 2.

Also on March 6, 2012, as part of a plea bargain, Santana pled no contest to an amended charge of voluntary manslaughter in count 1 and assault with a deadly weapon in count 2 and he admitted the arming enhancement in count 1.  In exchange for his plea

---

**1**     All further statutory references are to the Penal Code, unless otherwise indicated.

Santana was to receive a stipulated 12-year term on those two counts and the weapon enhancement. The agreement also provided that the gang enhancement in count 1 would be tried by the court and that count 3 and the gang enhancement in count 2 would be dismissed.

On March 27, 2012, the district attorney filed an information which, in pertinent part, charged Santana only with a gang enhancement with respect to his voluntary manslaughter offense.

On November 19, 2012, at the beginning of the court trial on the gang enhancement, the parties stipulated that E3 and ASW were criminal street gangs within the meaning of section 186.22, that the two gangs were enemies, that Santana, Sebastian Cruz, and Juan Lopez, were or had been members or associates of E3, and that victims Villarreal and Garcia were members or associates of ASW.

Fresno Police Detective Diana Trueba then testified as a gang expert that ASW and E3 were rival tagging crews and that tagging crews sometimes morph into criminal street gangs. Trueba further testified that on October 9, 2010, a fight occurred between Lopez and Villarreal at the Fresno Fair. According to Trueba, in gang culture gang members gain respect through fear and intimidation and if they just "let go" of something like the fight at the fair they would not be living up to the expectations of their gang. This required a gang member to do something the next time he saw the rival gang member. Many times this involved "repping," e.g., a gang member telling a rival gang member that he is still a member of a particular criminal street gang, which is considered by gang members to be both boastful and taunting. The rival gang members would be expected to respond by "repping" their own gang in some manner such as engaging in a shouting match or by fighting.

On March 25, 2011, Santana was walking with friends after school on Kings Canyon Road in Fresno when he saw Cruz and Lopez walking towards him. When they

3

met up, Cruz and Lopez told Santana they were just going to hang out and asked him to join them. Santana joined them and within five minutes they encountered Villarreal and Garcia.

Santana, Lopez and/or Cruz began "repping" E3 at Villarreal and Garcia and Villarreal responded by saying things like "F*** E3." Initially only Lopez and Villarreal fought because, according to Trueba, people like Santana and Cruz who were not originally involved in the fight would be there only as backup in case they needed to jump in.

Trueba also testified that although some gangs have friends or associates who "backup" the gang but are not members, E3 does not and you are either a member of E3 or you are not. Further, once a gang member drops out of a gang they have to completely disassociate themselves from other gang members, otherwise the former gang member would be expected to participate in gang activities like fighting or tagging and risk retaliation by the gang if they did not. Consequently, Trueba would not expect that someone like Santana, who claimed to have dropped out of E3, upon seeing friends who were still gang members, would run over and join them as he did when he joined Cruz and Lopez prior to the fight with Garcia and Villarreal. She also would expect that someone who was not a gang member would not get involved in the fight and instead would leave.

Trueba also testified that Santana had a history of denying being involved with E3 even though it was apparent that he was. On October 15, 2007, although Santana was arrested after he was caught tagging "E3" and his moniker "Blemx," he denied being a member of a tagging crew. On February 29, 2008, he was arrested for tagging "E3." When asked what "E3" meant, he said he was just writing the number 33 in a peculiar way. Trueba testified that in that situation Santana may not have wanted to be identified

4

by law enforcement as a gang member because his vandalism might be considered a more serious offense.

On November 21, 2008, after Santana was attacked by three people, he claimed that although he had been a member of E3 he had stopped tagging since the incident on February 29, 2008. However, according to Trueba, he continued his tagging activity after that date.

Trueba further testified that when Santana was arrested on March 25, 2011, he claimed he was no longer a member of E3 and that he quit because of his girlfriend. However, people do not go in and out of gangs. Once a person is out of a gang they stay away from other gang members because of the expectations of them. According to Trueba, if Santana truly were no longer a member of E3 on March 25, 2011, he would not have associated with Lopez or Cruz or joined them in fighting Villarreal and Garcia.

The prosecutor also introduced into evidence several pictures that showed Santana with several known E3 gang members including Joey Monsibais and Alex Morales, two very active members of E3. In some of the pictures Santana and/or the gang members pictured were making gang signs with their hands. In at least one photograph Santana and another gang member were jointly making the sign for E3 with their hands.

One of the pictures showed Lopez with a tattoo on his hand that read, "RIP Richard." According to Trueba, the tattoo was a tribute to Richard Sanchez, one of the founding members of E3 who was killed on August 25, 2010. Based on Lopez's tattoo, Trueba concluded that the photographs of Santana with other gang members were taken within seven months of the March 25, 2011, fight.

Additionally, the prosecution introduced a letter that was written by Santana while in custody in this matter that he mailed to Morales and that was confiscated by authorities. The letter included a drawing that depicted a wall with jail bars across the top portion. Several objects were superimposed on the wall including a nine-millimeter

5

handgun with smoke emitting from the barrel, two bullets, a knife with a picture of a clown on the blade, a marijuana leaf and a bottle of beer. The drawing also contained several notations including, "Santana," "E3," "RIP Thesis," "Fresno California," and "East" at the top of the drawing and "Side" at the bottom. In pertinent part the letter stated, "*I drew you guys a lil drawing* so you can put it on your wall and you can say my papa did that for me..." and that Santana was "*learning how to draw pretty [cool]*" because he took his time. (Italics added.)

Trueba testified that Santana's drawing was gang related and that it was connected to E3. Trueba further testified that E3 was one of the tagging crews aligned under the East Side Mafia gang (ESM) umbrella and that the words "East" and "Side" referred to ESM. She also noted that "Thesis" was the moniker for Sanchez, E3's founder, who was memorialized in tags or on T-shirts by the different tagging crews under the ESM umbrella. According to Trueba, the content of the letter, the drawing, and Santana's conduct in sending it to Morales were inconsistent with Santana's claim that he was no longer a member of E3 and consistent with someone who is willfully participating and associating with a criminal street gang.

In Trueba's opinion, Santana committed the voluntary manslaughter and assault offenses in association with a criminal street gang. She based her opinion in large part on evidence that Santana was a member of E3 including his previous admission that he was a member of E3 and his commission of the instant offenses in association with Cruz and Lopez who were E3 gang members. She also testified that in her opinion Santana was assisting in criminal conduct by gang members when the fight broke out on March 25, 2011, and that he intended to assist by associating with Lopez and Cruz before the fight started, by remaining at the location once the fight began, and by joining in the fight when Cruz joined in. Trueba further testified that when Lopez got knocked down during the fight Santana did not leave at that point because if he did, as a member of E3 he had

6

to join in or his friends would retaliate against him later on. Additionally, since gangs need to win fights in order to gain notoriety, when Garcia and Villarreal were getting the upper hand, it was necessary for Santana to bring out the knife to regain the advantage.

Santana testified in pertinent part that he was never a member of E3 and that he only hung out with E3 members. He also claimed that he joined the fight on March 25, 2011, only because Villarreal came charging at him after knocking Lopez out. Santana also testified that he did not create the drawing that was attached to the letter he sent to Morales and that he had another inmate draw it for him.

## DISCUSSION

Santana contends the evidence is insufficient to sustain the court's true finding on the gang enhancement because it fails to establish that he had the requisite specific intent. We disagree.

To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1).)

As to the first element, "[n]ot every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) However, the gang-related requirement for the enhancement may be shown by evidence indicating that several defendants "*came together as gang members*" to commit the offense, or that the offense could benefit the gang by elevating the gang's or gang members' status or advancing the gang's activities. (*Id.* at pp. 61-62.) If the evidence is sufficient to establish the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales* ).)

7

As for the second element of specific intent, it does not require "that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar*, *supra*, 51 Cal.4th at p. 67.) "[S]pecific intent to *benefit* the gang is not required." (*Morales*, *supra*, 112 Cal.App.4th at p. 1198.) The specific intent element "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, *supra*, 51 Cal.4th at p. 66.)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the [trier of fact] may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

In addition to the stipulation that Santana had been a gang member or associate, the prosecutor presented the following evidence that supports a finding that Santana was still a gang member when he committed the underlying manslaughter offense. Santana was arrested in 2007 and 2008 for tagging "E3" and/or his moniker, "Blemx" and he continued tagging after that arrest. Photographs taken within seven months of the March 25, 2011, fight and introduced into evidence showed Santana with several gang members. In some of the photographs he was making a hand sign for E3 by himself or in conjunction with other gang members. While incarcerated on the instant charges, Santana sent a gang-related drawing that he drew to Morales, a very active E3 gang member. Additionally, Trueba testified that although in some gangs associates and

8

friends of the gang would "backup" members of the gang, with E3 only fellow E3 gang members would "backup" gang members, which Santana did when he joined Cruz and Lopez in the fight against rival gang members Villarreal and Garcia. She also testified that if someone quit being a member of E3, like Santana claimed he had, Trueba would not expect to see that person associate with Lopez and Cruz or join them in fighting with rival gang members. The court could reasonably find from the foregoing circumstances that Santana was an E3 gang member when he fatally stabbed Villarreal.

It was also undisputed that Cruz and Lopez were E3 gang members.[2] Further, the court could reasonably find from the foregoing that the fight with Villarreal and Garcia was a continuation of an earlier gang fight and from the evidence that Santana's group "repped" E3 prior to fighting Villarreal, and Garcia that Santana, Cruz, and Lopez came together as gang members to fight ASW members Garcia and Villarreal. Thus, the record supports a finding that Santana committed his voluntary manslaughter offense in association with fellow E3 gang members.

Additionally, Trueba testified that E3 needed to win fights in order to maintain its notoriety and that this made it necessary for Santana to bring out the knife when E3 was losing the fight in order to regain the advantage for E3. This testimony supports a finding that Santana committed the voluntary manslaughter offense for the benefit of E3.

The court also could reasonably conclude from the circumstances discussed above that Santana intended to and did commit his voluntary manslaughter offense with known gang members. Thus, the evidence also supports a finding that Santana had the specific

---

[2]     During closing argument defense counsel conceded that Cruz and Lopez were gang members when the fight with Villarreal and Garcia occurred and that Santana committed the voluntary manslaughter offense in association with a criminal street gang. Santana does not contend otherwise on appeal, though he does challenge the specific intent requirement.

intent to promote, further or assist in criminal conduct by those gang members. (*Albillar*, *supra*, 51 Cal.4th at p. 67.)

During the prosecutor's direct examination of Detective Trueba the following colloquy occurred:

> "Q ... do you have any opinion as to whether the Defendant intended to assist, further, or promote criminal conduct by gang members on March 25th, 2011, at the time the fight broke out between E3 and ASW?
>
> "A Yes.
>
> "Q And what is that opinion?
>
> "A I believe that he was assisting in the criminal conduct."

Santana relies on the quoted colloquy to contend the evidence fails to establish that he acted with the requisite intent because Trueba never testified that Santana intended to assist, further or promote criminal conduct by gang members when "'the fight broke out between E3 and ASW.'" Instead, according to Santana, Trueba testified only that Santana "'was assisting in the criminal conduct' and was backing up his friends." Santana further contends that his intent when he pulled out the knife was, as he testified, "solely to protect himself" and that there is ample evidence in the record that corroborates his testimony. We disagree.

Any ambiguity in the quoted colloquy does not undermine the other evidence discussed above from which the court could reasonably have inferred that Santana acted with the requisite specific intent in committing his voluntary manslaughter offense. Further, the court was not bound by Santana's testimony that his intent when he stabbed Villarreal was simply to defend himself, which the court obviously did not credit, or by the alleged corroborating evidence. (*People v. Misa* (2006) 140 Cal.App.4th 837, 842 ["In considering the sufficiency of the evidence, [an appellate court] cannot reweigh the evidence, *as the credibility of witnesses and the weight to be accorded to the evidence are*

10

*matters exclusively within the province of the trier of fact*"], italics added.)  Accordingly, we reject Santana's contention that the evidence is insufficient to support the court's true finding on the gang enhancement.

## **DISPOSITION**

The judgment is affirmed.