Filed 11/20/25  P. v. Zhao CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064452 |
| v. | (Super. Ct. No. 22NF2998) |
| HUA ZHAO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Terri K. Flynn-Peister, Judge. Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury convicted Hua Zhao of premeditated and deliberate attempted murder (Pen. Code, §§ 664, sub. (a), 187, subd. (a)).[1] The jury also found Zhao personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) and inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the attempted murder. The trial court imposed a prison term of seven years to life plus four years.

Appointed appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, setting forth the facts of the case and requesting we review the entire record. Pursuant to *Anders v. California* (1967) 386 U.S. 738, appellate counsel identified two potential issues to assist in our independent review.[2]

After an examination of the entire record and appointed counsel's *Wende*/*Anders* brief, we find no reasonable arguable issues. (*People v. Wende, supra*, 25 Cal.3d 436.) The judgment is affirmed.

FACTUAL AND PROCEDURAL HISTORY

I.

COMPETENCY PROCEEDINGS

Prior to trial, trial counsel for Zhao expressed a doubt as to Zhao's mental competency to stand trial pursuant to section 1368. The trial court suspended criminal proceedings, appointed two medical doctors to evaluate Zhao pursuant to section 1369, subdivision (a)(1), and later

---

[1] All further statutory references are to the Penal Code.

[2] While this appeal was pending, appointed appellate counsel filed a motion indicating Zhao's request to abandon and dismiss this appeal which was denied by this court. As a result of our denial, Zhao was given additional time to file any supplemental brief on his own behalf, but he did not do so.

appointed a third. After all three doctors rendered their reports, both parties waived their right to a competency hearing and submitted on the doctors' reports. Based on the doctors' reports, the court found Zhao competent to stand trial and reinstated criminal proceedings.

## II.

### TRIAL TESTIMONY

On November 18, 2022 (the evening of the incident), H.N. went to his estranged wife's house to pick up their two young sons for his scheduled visitation. H.N. had filed for divorce as to his estranged wife, Y.Z., in 2021 and the divorce was still pending. H.N. testified he arrived five minutes late to the house at 8:05 p.m. He and Y.Z. had agreed the time for pick up would be between 7:00 and 8:00 p.m. As with previous visitations, H.N. stated on that evening he texted Y.Z. notifying her he was at the house and the children came out to get in H.N.'s vehicle. Y.Z. stepped out of the house to make sure the children had safely entered H.N.'s vehicle and then she went back inside. H.N. and Y.Z. did not speak to each other.

After Y.Z. retreated inside the residence, H.N. saw Y.Z.'s father, Zhao, come out of the house, followed by Y.Z. and Y.Z.'s mother. H.N. testified to not being able to see Zhao's hands when Zhao exited the house as both hands were in the front pocket of the hoodie Zhao was wearing. H.N. did not know what to expect from Zhao as H.N. and Zhao had a "cordial relationship" previously, but H.N. did not know if Zhao's feelings had changed towards H.N. due to the pending divorce. H.N. stated Zhao walked straight to the right front passenger side door of H.N.'s vehicle, smiled, and said, "'[Z]i-er, long time no see.'" H.N. "felt so warm in [his] heart" when Zhao addressed him in that manner. According to H.N., "zier" is a nickname for someone who is "even closer" than a son; only Zhao would use this nickname to address

3

H.N. During this exchange, H.N. did not see Zhao's hands as they remained in his front pockets.

H.N. testified Zhao said H.N.'s parents had given Zhao a family heirloom to deliver to H.N. Zhao pointed to a paper box that was wrapped in brownish paper on the driveway behind Y.Z.'s vehicle. Since H.N. recalled his parents mentioning "a long time ago" that they would bring some "old antique items," if the opportunity arose, H.N. was excited about the heirloom, exited his car, and walked towards the box.[3] As H.N. walked to the back of H.N.'s vehicle towards the box, Zhao also walked to the back of H.N.'s vehicle where they were almost "face to face." H.N. testified Zhao gestured with his right hand towards the box and stated, "'The heirloom is inside that box. Go and get it.'" As H.N. bent over to pick up the box he felt a "very severe attack" towards the "left middle" of his back. H.N. fell to the ground where he felt another attack on his back. H.N. testified Zhao then said, "'If you wanted money, go die.'" H.N. twisted around and was able to see Zhao stab him again with a "very long sharp knife" into H.N.'s left chest. H.N. stated Zhao then repeatedly stabbed H.N.'s chest and neck. H.N. tried to block and avoid the attacks but he was not able to gain control of the knife held by Zhao. H.N. testified he escaped by running to the other side of the street and Zhao followed. H.N. ran into a neighbor's open garage.

Up until the stabbing, H.N. stated Zhao was "cordial" to H.N., H.N. denied threatening or physically assaulting Zhao, Y.Z., Y.Z.'s mother, or H.N.'s children prior to the stabbing, and H.N. denied having a weapon. H.N.

---

[3] On cross-examination, H.N. acknowledged his parents had not mentioned to H.N. Zhao would be delivering an heirloom.

stated he suffered eight stab wounds and was hospitalized as a result.[4] H.N. indicated he continues to have intermittent pain in his chest because of the stab wounds which H.N.'s doctor has described as nerve pain.

Y.Z.'s neighbor testified that on the evening of the incident, at around 8:09 p.m., he had just finished parking his car in his garage when he saw H.N. standing inside. H.N. did not respond to the neighbor's request to leave. The neighbor described H.N. as "scared" and "very anxious, maybe paranoid." H.N. asked the neighbor to "'[c]all 911.'" H.N. said, "'Someone's trying to kill me.'"

Orange County Sheriff Department Deputy Tyler Perkins testified he and Deputy Michael Koyro responded to the neighbor's house on the evening of the incident, at approximately 8:00 p.m. Both deputies contacted the neighbor. Inside the house, the deputies found H.N. lying on the ground in a room. Upon discovering H.N. was bleeding from wounds to the back and chest, Perkins and Koyro began rendering medical aid. Koyro testified H.N. had "multiple stab wounds and lacerations to his upper body, upper torso." Perkins stated he could see lacerations and a "penetrating wound, like a puncture wound." Perkins said usually those "come from a form of a sharp-edged weapon."

Based on information from other deputies, Perkins searched the neighborhood for the vehicle H.N. reported belonged to him. H.N. told deputies the vehicle had its car door open with the lights on. Perkins found

---

[4] Testimony was also received from Cindy Lee, a trauma surgeon who treated H.N. at the hospital for "multiple stab wounds." Lee testified H.N. suffered wounds to the left anterior and right posterior chest which contain vital organs. Over objection by Zhao, Lee also testified H.N. could have died from his wounds to the left chest.

the vehicle in this state at Y.Z.'s house. At the house, Perkins saw Y.Z. and Zhao. Perkins testified Y.Z. served as an interpreter for Zhao as it appeared Zhao did not understand English. Y.Z. was "cooperative, but she was hysterical" throughout Perkins's contact with her. Initially, Perkins only asked Zhao and Y.Z. to remain where they were. Perkins testified Zhao, without prompting, made gestures with his hands and arms three different times that Perkins interpreted as a submission to being handcuffed.[5] Perkins stated Zhao was eventually handcuffed; during a search of Zhao, Perkins noticed a small scratch or bloodstain on Zhao's right hand. During a search of Y.Z.'s house, Perkins located a black-handled steak knife with what appeared to be blood on it in a knife block in the kitchen.[6]

Y.Z. testified under a grant of immunity which required her to testify truthfully. Y.Z. is Zhao's daughter; the two have a close relationship. Zhao and Y.Z.'s mother are married and live together in China. When Y.Z.'s parents were in China, Y.Z. would talk to her mother once a month or once every couple of months during which Zhao would sometimes join the conversation. During most of these conversations, Y.Z. would share, mostly with her mother, how things were going.

[5] Video footage from the body-worn cameras of Perkins and Koyro at Y.Z.'s home were played for the jury.

[6] Forensic Scientist Chloe Kerby testified the stain on this knife's blade tested positive for blood. Kerby also swabbed the stain and knife handle for DNA. The knife had a five-inch blade with a total length of about nine inches. Forensic scientist Danielle Wieland analyzed H.N.'s and Zhao's DNA samples with the two DNA samples from the knife's blade and one sample from the knife handle. The two samples from the knife's blade "yielded a single-source male profile that excluded Zhao." The knife handle indicated a "mixture of DNA consistent with three individuals," one of them being Zhao and the other H.N.

Y.Z. and H.N. were married in 2012, and they have two sons. Y.Z. and H.N. both testified that during their marriage, Zhao had provided financial assistance to allow Y.Z. and H.N. to purchase their first house. Y.Z. testified Zhao provided $480,000 for this purchase. Y.Z. stated during the first couple of years of Y.Z. and H.N.'s marriage, Zhao provided financial support a "couple times a year," sometimes in the amount of "maybe [$]150,000, sometimes maybe [$]200,000."

Y.Z. indicated H.N. left her and their sons in June 2021, which surprised Y.Z.; she believes H.N. left because of his girlfriend. Y.Z. stated she was unemployed at that time, so she had to sell stock and her jewelry for cash to support herself and her sons. Y.Z. testified her parents knew her marriage was having difficulties and she asked for their opinion on whether she should file for divorce. Y.Z. stated Zhao cried when she talked to her parents about the divorce; Zhao blamed himself. Y.Z. said Zhao was "very supportive" and told Y.Z. no matter what happened, they would support her.

H.N. filed for divorce in October 2021 and would see the children only once every couple of months. Y.Z. did not want a divorce because of her religious beliefs and the children's ages. H.N. was also ordered to pay monthly child support but only paid Y.Z. for one or two months. Y.Z. said when she told Zhao about the divorce petition, Zhao tried to comfort her and told her to find a good attorney.

In early November 2022, Zhao and Y.Z.'s mother came from China to visit. Zhao and Y.Z.'s mother had last visited in 2016 when Y.Z. and H.N. were still together. During that 2016 visit, Y.Z. saw Zhao interact with H.N. and "[t]hey were pretty close" and "had a really good relationship."

During the November 2022 visit, Y.Z.'s parents planned on staying for a few months. Y.Z. stated they were all pretty happy with their

7

reunion and she did not talk much about the divorce. Y.Z. had obtained a job, was awarded primary custody of her sons, and had obtained her green card approval.

On the evening of the incident, the children went outside and Zhao followed them. Y.Z. indicated she had earlier informed Zhao that H.N. would be coming to pick up the children. Y.Z. testified she stood in the doorway, as usual, as her sons went outside to meet H.N., who remained inside his car. Looking through the front door's window, Y.Z. saw the boys get into the car and then Zhao and H.N. get into a fight. Y.Z. described the fight as pushing and punching; she was unsure who threw the first punch. It was dark outside, and Y.Z. heard no screaming. Y.Z. stated she ran outside and tried to stop the fight by yelling at them to stop, but they had run away. Y.Z. did not call 911.

Y.Z. testified when Zhao returned to the house after the fight, she did not initially ask him why it happened and did not see any injuries on him. She thought H.N. and Zhao fought because Zhao was upset about how H.N. had treated her. Zhao told Y.Z. not to hire an attorney for him. Zhao walked outside of the house and told Y.Z. to remain inside. The police then arrived at Y.Z.'s residence, and Zhao was arrested.

Zhao testified Y.Z. is his daughter and H.N. is his son-in-law. Zhao stated he and H.N.'s parents live in the same neighborhood in China; he considers H.N. to be his own son. Although Zhao stated he was not initially aware of Y.Z.'s separation from H.N., he later became aware.

Zhao stated he came to visit Y.Z. and his grandchildren in November 2022 after having last visited in April 2016. Prior to his 2022 visit, Zhao informed H.N.'s parents of the trip. They did not ask Zhao to bring anything over for them. Zhao testified he loves Y.Z. and H.N.

8

Zhao testified that on the evening of the incident, he had picked the children up from school, but it was H.N. who was supposed to pick them up from school that day. H.N. had texted Y.Z. indicating he would instead pick the children up at 7:00 p.m. H.N. had still not picked the children up at 7:40 p.m., and Zhao had fallen asleep only to be woken by his grandchildren at what he thought was 9:00 p.m. Zhao described being upset; his blood pressure was elevated, he had blurred vision, and his "mind was not clear." When H.N. arrived at Y.Z.'s house, Zhao remembered going outside towards H.N. and scolding him for being late to pick up his children. Zhao never called H.N. "zi-er" as Zhao was "very upset." Zhao stated he was using his hand and trying to grab H.N. whilst scolding H.N. H.N. then tried to hit Zhao and the two got into a physical altercation, during which H.N. slipped and then ran away. Zhao did not run after H.N. as Zhao was "shaking so badly" he did not think he "would be able to go anywhere."

Zhao did not remember grabbing a knife or even touching a knife that night, and denied having any intention to kill H.N. Zhao also denied stabbing H.N.; Zhao stated he did not know how H.N. received eight stab wounds. Zhao was "just heated in anger" for H.N. being late. Zhao indicated at the time he did not know H.N. was not providing any financial support to Y.Z. or the children. After H.N. ran away, Zhao went back inside Y.Z.'s house to look for medicine. Zhao testified he stayed inside the house until the police arrived. After the police arrived, Zhao remembered speaking to Y.Z. in "Chinese," but he did not remember what he said to Y.Z. Zhao stated he told Y.Z. she did not have to find an attorney for him because he was not in the wrong.

DISCUSSION

Zhao's appellate counsel suggests we consider whether sufficient evidence shows Zhao was competent to stand trial and whether there was sufficient evidence to support the jury's true finding as to the premeditation and deliberation allegation. We find there is substantial evidence in the record to support both findings.

As to the first issue raised by appellate counsel, in a competency hearing conducted under sections 1368 and 1369, a defendant is presumed competent to stand trial "unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." (§ 1369, subd. (c)(3).) The party trying to prove incompetence has the burden of proof. (*People v. Medina* (1990) 51 Cal.3d 870, 885.) A mentally incompetent defendant is defined as a person who, "as a result of a mental health disorder or developmental disability . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

On review of a mental competency finding, we look to whether it is supported by "substantial and credible evidence." (*People v. Campbell* (1976) 63 Cal.App.3d 599, 608.) In doing so, we review the evidence in the light most favorable to the finding. (*People v. Mendoza* (2016) 62 Cal.4th 856, 871.) As noted *ante,* both parties submitted on the reports of the medical examiners at the hearing on Zhao's competency. In their reports, the medical examiners detailed their interviews and assessments of Zhao and two of the three ultimately opined Zhao was competent to stand trial. These reports were the only evidence adduced at the competency hearing, and based on the parties' stipulations, the trial court relied on these reports in making its finding of mental competency within the meaning of section 1367. More than

10

substantial evidence supports the court's finding, by a preponderance of evidence, that Zhao was mentally competent to stand trial under section 1367, subdivision (a).

In evaluating the second issue raised by appellate counsel, whether there was sufficient evidence for the jury to find Zhao acted with premeditation and deliberation, we "'"""must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'""" (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) The standard is the same under the state and federal due process clauses. (*People v. Rowland* (1992) 4 Cal.4th 238, 269.) "We presume "'in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved.'" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.) We must accept logical inferences the jury might have drawn from that evidence. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Unless it is clearly shown that "'on no hypothesis whatever is there sufficient substantial evidence to support the verdict,'" the conviction will not be reversed. (*People v. Misa* (2006) 140 Cal.App.4th 837, 842.)

The record contains substantial evidence to support the jury's true finding as to the premeditation and deliberation enhancement. A reasonable jury could conclude, from the witnesses' testimony regarding H.N.'s injuries and the weapon utilized, that Zhao acted with deliberation and premeditation in committing the attempted murder.

11

After an independent review of the entire appellate record, we find no arguable issues. We therefore affirm the judgment.

## DISPOSITION

The judgment is affirmed.


MOTOIKE, ACTING P. J.

WE CONCUR:


MOORE, J.


DELANEY, J.